242 P.3d 825 (2010)
Michael S. JONES, R.Ph., Petitioner,
v.
STATE of Washington and its DEPARTMENT OF HEALTH; Washington State Board of Pharmacy; Phyllis Wene and Stan Jeppesen, individually and as investigators for the Washington State Board of Pharmacy; and Donald Williams, individually and as executive director of the Board of Pharmacy, Respondents.
No. 80787-6.
Supreme Court of Washington, En Banc.
Argued June 23, 2009.
Decided November 4, 2010.
*827 D. Murphy Evans, Brownlie Evans Wolf & Lee LLP, Bellingham, WA, for Petitioner.
Catherine Hendricks, WA Attorney General, John Robert Nicholson, Office of the Attorney General, Seattle, WA, for Respondents.
FAIRHURST, J.
¶ 1 Without giving him notice or an opportunity to be heard, the Washington State Board of Pharmacy (Board) summarily suspended Michael S. Jones' business and professional licenses to practice pharmacy due to unsatisfactory inspection reports. During the subsequent administrative proceeding, Jones agreed to the revocation of his pharmacy location license and a five-year suspension of his professional license. Jones now sues the State of Washington, the Department of Health (DOH), the Board, the Board's executive director, and two pharmacy inspectors, alleging that the suspension was based on an improper investigation and hearing. At issue is whether the Board's inspectors are entitled to qualified immunity from liability under 42 U.S.C. § 1983 for violations of Jones' right to due process. Also at issue is whether the exhaustion doctrine *828 bars Jones' state tort claims because he waived two opportunities for administrative hearings. The Court of Appeals held that Jones' right to due process was not violated and that Jones failed to exhaust his administrative remedies. We reverse.

I. FACTUAL AND PROCEDURAL HISTORY[1]
¶ 2 The Board conducts "periodic inspections to determine compliance with the laws regulating the practice of pharmacy." WAC 246-869-190(1). Board inspectors assign the pharmacy a "`[c]lass A'" classification for an inspection score of 90 to 100; "`[c]onditional'" for 80 to 89; and "`[u]nsatisfactory'" for below 80. WAC 246-869-190(3)(a)-(c). A pharmacy classified as unsatisfactory is "subject to disciplinary action" if the score does not increase to 90 or better within 14 days. WAC 246-869-190(5). A pharmacy's license is subject to summary suspension for an "unsatisfactory" classification if the pharmacy's conditions "represent a clear and present danger to the public health, safety, and welfare." WAC 246-869-190(8).

A. Jones' pharmacy is inspected four times from December 1998 to August 1999, with fluctuating inspection scores
¶ 3 Jones first began practicing pharmacy in Washington in 1980. In 1995, he purchased a Medicine Shoppe pharmacy franchise in Marysville and served as its sole pharmacist. Board inspector Phyllis Wene conducted a routine inspection of Jones' pharmacy on December 17, 1998, and assigned an unsatisfactory score of 79. Nearly seven weeks later, on February 3, 1999, Wene reinspected and assigned a class A score of 94. Jones says the condition of his pharmacy got even better by the summer of 1999.
¶ 4 Despite this improvement in conditions, Wene and Board inspector Stan Jeppesen assigned an extremely low unsatisfactory score of 48 to Jones' pharmacy on July 12, 1999. At this inspection, Jones says he "was subjected to non-stop harassment by Wene and Jeppesen," and he lists many examples: "Jeppesen yelled at me and banged his hands on the pharmacy counter while I tried to select, count, and prepare medications"; "Wene and Jeppesen stood on either side of me and made repeated demands in rapid-fire succession"; and "Jeppesen stood directly behind mewithin six inchesand interrupted me while I entered information on the computer system." Pl.'s Clerk's Papers (PCP) at 766. Jones reports a history of bad blood with the Board: In 1994, he confronted a Board inspector and told him to stop harassing his co-worker, and only three weeks after this incident, the Board placed Jones on probation for misfilling a prescription. On August 10, 1999, Wene and Jeppesen reinspected and assigned an unsatisfactory score of 56.
¶ 5 Jones alleges that "the scoring of the deficiencies was conducted in an arbitrary and capricious manner" and testified that "in numerous instances the inspector deducted five points (the maximum per deficiency) for minor discrepancies." PCP at 768. Further, Jones claims there were "numerous errors in each inspection report." Id. For instance, in December 1998, Wene cited Jones for "[v]arious... records required by state and federal law were either inaccurate, incomplete or not available." Def.'s Clerk's Papers (DCP) at 416.[2] In February 1999, she again cited Jones for violations relating to "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. In July and August, Jones was cited for violating WAC 246-887-020, which requires a pharmacist who fills prescriptions for controlled substances to comply with federal regulations for inventory control. However, Jones declares that by July, "I did have the required DEA [ (Drug Enforcement Administration) ] *829 order forms and invoices but I kept them in different places." PCP at 767. And in August, he says, "I had matched DEA order forms with invoices" and "I did perform the inventory for Schedule II and Schedule III drugs prior to the second inspection." PCP at 767-68. In a declaration to the Board, Jones admitted some minor record-keeping problems, but the July and August reports do not explain what was different from the prior two inspections.
¶ 6 In December 1998, Wene cited Jones for "[d]ispensing the majority of prescriptions in non child-resistant containers without a written request from either the patient or the prescriber." DCP at 416. In February 1999, Jones might have committed this infractionthe record is not clearbecause Wene cited Jones for "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. Jones was definitely cited for the same violation in July and August. PCP at 651-52. The inspectors were able to identify only a small percentage of the necessary signatures, and Jeppesen described Jones' signature-tracking system as disorganized. However, Jones declares, "I did have written records of patients' requests for non-child resistant caps." PCP at 767. He further stated, "It was also my understanding that Mrs. Wene approved of my system when I received a 94 on February 3, 1999. That was the same system that was in place in July and August." DCP at 342.
¶ 7 In December 1998, Wene cited Jones for "[f]ailing to obtain chronic conditions on patients of the pharmacy." DCP at 416. In February 1999, again, Jones might have been guilty of the same; the record discloses only that Wene cited Jones for "inaccurate, incomplete or missing records required by state or federal law." DCP at 417. Jones received the maximum penalty of minus five points in July and August 1999 for failing to track information on patient allergies and chronic conditions and for failing to keep the required audit trail of orders and order modifications. See ch. 246-875 WAC. Jones insists that he "did enter allergy and chronic disease information about customers into my computer record," but he acknowledges that "unbeknownst to me the QS-1 computer system was recording the information but not processing it." PCP at 767. He says that during the August inspection, he discovered the error when he called the computer system vendor, and he had the vendor correct the error at that time. DCP at 341. The record does not disclose why his latter violations, which stemmed from a computer malfunction, were worse than any violations during the first two inspections.
¶ 8 In December 1998, Jones lost points (as with all the cited infractions from this date, we do not know how many points) because "[m]any of the prescriptions in the will call area had labeled expiration dates exceeding the manufacturer's expiration date." DCP at 416; see WAC 246-869-150. In July 1999, Jones received a 15 point deduction for having 24 or more items in stock past their expiration date. PCP at 651. Jones admitted in a declaration to the Board that he had some outdated products, but he says he "did not have 38 outdated items," and he insists, "I had a regular process for checking outdated medications." DCP at 214. In August 1999, Jones received a deduction of five points for 11 outdated items. However, Jones says that by August, "I did not have outdated medications on the shelf." DCP at 214. At the least, Jones claims he did not have as many outdated items as the inspectors assert, and it is not clear why Jones was penalized severely for the same infraction he committed in December 1998.
¶ 9 In December 1998, Jones was cited because "[m]ost of the prescriptions in the will call area contained the incorrect NDC [(National Drug Code) ] number for the product in the prescription container." DCP at 416. In July and August 1999, Jones was again cited for this violation, and he received the maximum deduction of five points. He admits that some medications on his shelves did not match their respective container's NDC number. But he says, "I never substituted a drug that had been prescribed by a doctor," PCP at 767, and the record again does not explain the difference between the assessments over time.
¶ 10 Jones also received deductions for improper record-keeping of prescription files four points in July and five points in August. *830 But again, in both the earlier December 1998 and February 1999 inspections, Jones was cited for failing to keep his records in accordance with state law, and the record does not explain whether the July and August violations were materially different. Jones also received deductions for improper prescription labelsa total of three points in July and ten points in August. The record is not clear whether these deductions were separate deductions for the same alleged NDC labeling problems. Finally, in July, Jones received deductions of two points for keeping an outdated reference source and four points for his pharmacy assistant not wearing a name badge or signing a proper certification, and one point for keeping dirty dishes in a sink. By August, apparently these violations were cured.

B. Without giving Jones prior notice or a hearing, the Board suspends his licenses and orders his pharmacy closed
¶ 11 On August 16, 1999, the executive director of the Board, Donald Williams, filed an ex parte motion for summary action to immediately suspend Jones' licenses and close his pharmacy. On August 17, 1999, without a hearing involving Jones, the Board granted Williams' motion after finding Jones' conduct "placed the patients of his pharmacy at serious risk of significant harm." DCP at 323. Later that day, Wene served Jones with a copy of the Board's order and a notice explaining that Jones had the right to request a "prompt" hearing to be held three and a half weeks later, on September 10, 1999, or instead a "regularly scheduled" hearing. DCP at 329. The notice further explained that Jones would waive his right to the September 10, 1999 hearing if he chose to file a written motion challenging the summary action.[3]

C. Jones utilizes the administrative process to challenge the summary suspensions; Jones loses his business
¶ 12 On August 30, 1999, Jones filed a written motion to modify the Board's ruling and stay the summary suspension of his licenses and thereby waived the September hearing. In a supporting declaration, Jones said, "The suspensions put me in a horrible financial bind." PCP at 770. On August 31, 1999, The Medicine Shoppe International terminated Jones' franchise. On September 7, 1999, a three-person Board panel denied Jones' motion. On September 13, 1999, Jones petitioned the Board for an expedited hearing. DOH objected to Jones' request to set the hearing outside of the Board's regular schedule, and a hearing was set for October 21, 1999. On October 18, 1999, DOH moved for a continuance, and the hearing was reset for December 7, 1999.
¶ 13 Having lost his business and the financial resources to pay for his defense, Jones did not go through with the hearing. He decided to negotiate a settlement that would prevent the permanent revocation of his professional license. On January 11, 2000, Jones signed stipulated findings of fact and conclusions of law, as well as an agreed order revoking his license for the pharmacy and suspending his pharmacist license for five years. In the stipulations, he "acknowledge[d] that the evidence is sufficient to justify the ... findings," DCP at 415, and he waived his right to a full adjudicative hearing. He did not waive his right to sue. The Board accepted and entered the order on February 4, 2000.

D. Jones brings suit
¶ 14 In 2002, Jones filed suit against the State, DOH, the Board, Williams, and Wene and Jeppesen. The trial court granted partial summary judgment, leaving three of Jones' claims: (1) violation of due process (42 U.S.C. § 1983) against Wene, Jeppesen, and Williams in their individual capacities; (2) negligent supervision against all defendants; and (3) tortious interference with a business expectancy against all defendants.
¶ 15 The Court of Appeals reversed the trial court's denial of summary judgment on Jones' remaining claims, holding that Williams was entitled to absolute immunity, *831 that Jones' right to due process was not violated, and that Jones' tort claims were barred by his failure to exhaust administrative remedies. Jones v. State, 140 Wash. App. 476, 166 P.3d 1219 (2007).
¶ 16 We granted Jones' petition for review. Jones v. State, 164 Wash.2d 1019, 195 P.3d 89 (2008). Jones does not challenge the Court of Appeals' holding that Williams is absolutely immune from Jones' claims.

II. ANALYSIS

A. Whether Wene and Jeppesen are entitled to qualified immunity from liability under § 1983 for violating Jones' right to due process
¶ 17 When the defendant moves for summary judgment in a § 1983 suit and raises a qualified immunity defense, the court has two questions before it. One is whether the plaintiff's allegations establish a connection between the defendant's conduct and the violation of a constitutional right. Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). There must be "a genuine issue as to whether the defendant in fact committed those acts." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The second question is whether the defendant's conduct was objectively reasonable in light of clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court may answer these questions in whichever "order of decisionmaking that will best facilitate the fair and efficient disposition of each case." Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 821, 172 L.Ed.2d 565 (2009). These are both "essentially legal question[s]" for the court to decide. Mitchell, 472 U.S. at 526, 105 S.Ct. 2806. We employ de novo review of legal questions decided on summary judgment. CR 56(c); M.W. v. Dep't of Soc. & Health Servs., 149 Wash.2d 589, 595, 70 P.3d 954 (2003).

1. The procedural due process right at issue

¶ 18 To answer either of these questions, we find it necessary to start with an analysis of the constitutional right at issue. See Pearson, 129 S.Ct. at 818 ("`[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be.'" (alteration in original) (quoting Lyons v. City of Xenia, 417 F.3d 565, 581 (6th Cir.2005) (Sutton, J., concurring))). The Fourteenth Amendment grants the right to due process of law to a person facing a deprivation of his or her property by the state. The State[4] argues that where a state official's conduct is limited to producing an investigative report, the official does not deprive anyone of property. The State believes that the responsibility for providing adequate procedures rests only with the state officials who make the subsequent decision to suspend or revoke the license. From these premises, the State argues that no procedural due process right is at issue. Because the decision to deprive Jones of his licenses rested with Williams and the Board, Wene and Jeppesen cannot be liable for any due process violation that occurred. We disagree.
¶ 19 In the criminal law context, the deprivation of liberty based on fabricated evidence is a violation of a person's constitutional right to due process. See, e.g., Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (noting that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"); Washington v. Wilmore, 407 F.3d 274, 283 (4th Cir. 2005) (holding that there is a "constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer"); Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir.2004) (describing the fundamental concept "that those charged with upholding the law are prohibited from deliberately fabricating evidence"); Zahrey v. Coffey, 221 F.3d 342, 344 (2d Cir.2000) (holding "that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity"). We conclude that this due process right applies with equal force in a civil proceeding, *832 such as the administrative adjudication in this case, because a pharmacist's professional and business licenses are property interests protected by the due process clause. Cf. Ongom v. Dep't of Health, 159 Wash.2d 132, 139, 148 P.3d 1029 (2006) (holding that a nurse, as with a medical doctor, has a protected property interest in a professional license).
¶ 20 Of course, the state is generally excused from providing a license holder with prior notice and a hearing if an emergency justifies summary action. See, e.g., Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 299-300, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); N. Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306, 319-20, 29 S.Ct. 101, 53 L.Ed. 195 (1908). Still, we do not think the emergency can be fabricated. The procedural due process right is not to be free of the fabrication itself, but rather to be free from the subsequent deprivation of property based on the false evidence. See Zahrey, 221 F.3d at 348-49. When a summary procedure is based on a fabricated emergency, the procedure is inherently defective. Thus, while an investigator might not initiate or decide the outcome of the proceeding, the inspector still can cause the violation of a procedural due process right. As long as a sufficient causal connection is established between the defendant official's conduct and the violation, a § 1983 plaintiff does not have to prove that the defendant official personally violated the plaintiff's right. Under § 1983, "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." (Emphasis added.)
¶ 21 The causation element of § 1983 is met if the plaintiff shows the defendant official "`set[] in motion a series of acts by others which the [official] knows or reasonably should know would cause others to inflict the constitutional injury.'" Merritt v. Mackey, 827 F.2d 1368, 1371 (9th Cir.1987) (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978)).[5]
¶ 22 We agree with the State that Jones has not presented evidence that Wene and Jeppesen conspired with Williams and the Board to deprive Jones of his licenses without due process. However, as the foregoing discussion makes clear, Wene and Jeppesen are liable under § 1983 if they wrongfully fabricated an emergency and knew or reasonably should have known that this fabrication would cause Williams and the Board to find an emergency and summarily suspend Jones' license without a predeprivation hearing.[6] The question on summary judgment is whether enough evidence in the record establishes a genuine issue of material fact.

2. Genuine issue of material fact exists over whether Wene and Jeppesen's conduct caused a violation of Jones' constitutional right

¶ 23 Because this case is before us for a review of a ruling on a motion for *833 summary judgment, we must review the facts and the reasonable inferences from them in the light most favorable to Jones as the nonmoving party. Bishop v. Miche, 137 Wash.2d 518, 523, 973 P.2d 465 (1999). A genuine issue of material fact exists if, after weighing the evidence, reasonable minds could reach different factual conclusions about an issue that is material to the disputed claim. See Hartley v. State, 103 Wash.2d 768, 775, 698 P.2d 77 (1985). We conclude there is a genuine issue of material fact; a reasonable juror could infer Wene and Jeppesen arbitrarily lowered Jones' inspection scores in order to fabricate an emergency that would induce the Board to shut down Jones' pharmacy. This is a very close case, but the key facts are Wene's December 1998 investigation and the passing score that Wene gave in February 1999.
¶ 24 For instance, at the December 1998 inspection, Wene found the same sort of violations that she and Jeppesen later said were worthy of scores of 48 and 56 in July and August, respectively. In December 1998, Jones was failing to get information on patients' chronic conditions, using nonchild-resistant containers, keeping medications past their expiration date, filling prescriptions with medications that did not match the containers' NDC numbers, and "records required by state and federal law were either inaccurate, incomplete or not available." DCP at 416. As far as a reasonable juror could conclude, this last statement meant problems with prescription files and DEA record-keeping. Despite these violations, Wene gave Jones a score of 79 in December 1998, not the dramatically failing scores he received later. The State does not present evidence of the violations in February 1999 that merited deductions of six points, for an overall passing score of 94. We know only that Jones' violations related to "inaccurate, incomplete or missing records required by state or federal law," DCP at 416-17, which could mean Jones committed a host of violations in February 1999 without receiving harsh scoring, such as improper DEA record-keeping, failure to track patients' chronic conditions, and disorganized prescription records. By summer, Jones' pharmacy was in better condition, but Wene and Jeppesen changed the assessment from a 94 to badly failing scores in July and August 1999.
¶ 25 Like the first two inspections, the July and August 1999 inspection reports certainly suggest that some violations were occurring. Jones admits as much, although he denies some of the violationsor at least disagrees with the severity that Wene and Jeppesen claimed. The only apparent material difference between these inspections and the first two is the level of detail in describing Jones' violations. What clearly changed was the assessment and scoring of Jones' pharmacy. Notably, the record indicates that in each of the four inspections, Wene or Jeppesen found violations relating to state and federal laws regarding record-keeping. And the Board cited "the condition of the pharmacy, especially the violations related to record-keeping," as the reason for why a summary suspension was necessary. DCP at 323 (emphasis added). Inexplicably, however, the record does not disclose why the Board's inspectors chose suddenly in July 1999 to start scoring Jones severely for these record-keeping violations.
¶ 26 That Wene and Jeppesen fabricated an emergency that would justify a summary suspension is a conclusion that a reasonable juror might reach from (1) the radical change in scoring over time, (2) the lack of apparent reasons for the change, (3) Jones' insistence that many of the violations were not as bad as the inspection reports claimed, and (4) the inspectors' aggressive behavior at Jones' pharmacy. Further, a reasonable juror could find that Wene and Jeppesen knew, or should have known, that Williams would seek, and the Board would grant, an order summarily suspending Jones' licenses on the basis of the fabricated emergency. The Board would have been derelict had it ignored such unsatisfactory scores, and it had the authority to summarily suspend Jones' licenses. WAC 246-869-190(8); WAC 246-11-300(1)(a), (c). Our view of Wene and Jeppesen's conduct might have been different if the State had adduced irrefutable evidence that 48 and 56 were scores typical for the violations found or that the condition of Jones' pharmacy was in fact far better in February 1999 than it was in July *834 and August 1999. As this case is presented to us, however, a jury might reasonably credit Jones' version of events.[7]

3. Qualified immunity

¶ 27 Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions" are immune from § 1983 suits "if their conduct is objectively reasonable when measured against clearly established law." Robinson v. City of Seattle, 119 Wash.2d 34, 64-65, 830 P.2d 318 (1992). For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It is not necessary that a court have previously held the official's conduct is unconstitutional; rather, "in the light of pre-existing law the unlawfulness must be apparent." Id. We hold that Wene and Jeppesen are not entitled to qualified immunity.
¶ 28 Several cases define the contours of the due process right at issue. To be sure, an official's assessment of an emergency is given judicial deference because "[t]he law should not discourage officials from taking prompt action to insure the public safety." Catanzaro v. Weiden, 188 F.3d 56, 63 (2d Cir.1999). However, the Second Circuit has recognized that "abusive and arbitrary" assessments of an emergency cannot justify deprivations without prior notice or a hearing. Id. Further, the Ninth Circuit stated in Armendariz v. Penman, 31 F.3d 860 (9th Cir.1994), vacated in part on other grounds, 75 F.3d 1311 (9th Cir.1996), that an emergency is impermissibly fabricated when an official knows an emergency does not exist but persists with declaring an emergency. Id. at 866. Finally, the First Circuit has observed, "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals." Limone, 372 F.3d at 44-45. In light of these admonitions, it would have been apparent to a reasonable official that Wene and Jeppesen were prohibited from knowingly and arbitrarily changing Jones' inspection scores and thus fabricating a sense of emergency.

B. Whether the exhaustion doctrine bars Jones' state tort claims because he waived two opportunities for administrative hearings
¶ 29 A party is required to exhaust available administrative remedies prior to bringing a claim in court when (1) the claim is cognizable in the first instance by an agency alone, (2) the agency has clearly established mechanisms for resolving complaints by aggrieved parties, and (3) the administrative remedies can provide the relief *835 sought by the party. Smith v. Bates Technical Coll., 139 Wash.2d 793, 808, 991 P.2d 1135 (2000); Retail Store Employees Union, Local 1001 v. Wash. Surveying & Rating Bureau, 87 Wash.2d 887, 907, 558 P.2d 215 (1976). Even if this doctrine required Jones to exhaust his tort claimsan issue we do not decide herehis claims would not be barred because Jones exhausted the administrative remedies available. A party exhausts administrative remedies when there is a final agency determination. See Rains v. Dep't of Fisheries, 89 Wash.2d 740, 744, 575 P.2d 1057 (1978). A final determination arises out of a final agency action. Charles H. Koch, Jr., Administrative Law and Practice § 13.20, at 335 (2d ed. 1997). A final agency action "implies a definitive act of the agency, action which is binding until and unless it is set aside by a court." Id. Here, the agreed order was a final agency determination binding on all parties. Jones exhausted the administrative remedies.
¶ 30 Although Jones waived his right under WAC 246-11-330 to request a "prompt" hearing after the summary suspension, this waiver does not change the fact that the Board reached a final determination, and thus Jones exhausted administrative remedies. The exhaustion doctrine does not mean that a person subject to an adverse agency action must take advantage of the most expeditious review procedures available. The exhaustion doctrine's purpose is not to force the quickest resolution possible or to second-guess the aggrieved party's strategic choices. To conclude otherwise would encourage agencies to rush aggrieved parties without giving them the chance to fully prepare a defense. If an aggrieved party waived the expedited hearing, the agency could then prolong the proceedings, as the Board did here (it rejected Jones' request to hold an immediate hearing after he filed his motion to modify and for a stay, and then it continued the regularly scheduled hearing over Jones' objection) in hopes of forcing a settlement. That cannot be right. As long as an aggrieved party takes one of the available procedural paths toward a final agency determination, as Jones did here, there is no failure to exhaust.
¶ 31 By accepting and entering the stipulations and agreed order, the Board ended the administrative process. It is true that the Board never had an adjudicative hearing because Jones waived his right to a regularly scheduled hearing as part of the agreed order. However, as the State itself notes, the Board had the discretion to reject the agreed order. Exhaustion is necessary to give the agency a complete opportunity to review the aggrieved party's claim. The Board had its opportunity and decided to enter the agreed order; there was nothing left for Jones to exhaust.[8]

IV. CONCLUSION
¶ 32 We reverse the Court of Appeals' holding that pharmacy inspectors Wene and Jeppesen are not subject to Jones' § 1983 claim. There is a genuine issue of material fact concerning whether they caused a violation of Jones' due process right to be free from summary proceedings based on a fabricated emergency. Wene and Jeppesen's conduct, when viewed favorably to Jones as the party opposing summary judgment, was unreasonable in light of clearly established law. We also reverse the Court of Appeals' holding that Jones failed to exhaust the available administrative remedies, and we leave for another day the question whether a plaintiff, such as Jones, was required to exhaust administrative remedies.
*836 WE CONCUR: CHARLES W. JOHNSON, RICHARD B. SANDERS, TOM CHAMBERS, and DEBRA L. STEPHENS, Justices.
MADSEN, C.J. (dissenting).
¶ 33 The Court of Appeals correctly determined that summary judgment should have been granted in favor of the respondents and that Michael Jones's 42 U.S.C. § 1983 and state tort claims should be dismissed in their entirety. Unfortunately, the majority prolongs this baseless litigation as a result of its conclusion that genuine issues of material fact remain to be resolved. A close look shows that this is not the case and that an emergency situation justified summary suspension of Mr. Jones's pharmacist license because his numerous violations of state and federal laws put patients at serious risk of significant harm.
¶ 34 Summary judgment should have been granted on Mr. Jones's tort claims. He stipulated to findings of fact, conclusions of law, and an order suspending his pharmacist's license for five years and revoking his pharmacy's license. He explicitly agreed that there was sufficient evidence to support the stipulated facts, and he expressly stipulated to the conclusion of law stating that the facts establish numerous violations of statutes and administrative regulations governing pharmacists and pharmacies. He claims, though, that he is not bound by these facts because the stipulation to facts is prefaced by a statement that he did not admit to the conduct. He should not be permitted this end run. If he were able to show that the evidence that he stipulated was sufficient was in fact fabricated, as he now claims, he should have made this argument to the Washington State Board of Pharmacy (Board). He did not. Regardless, he has failed to produce sufficient evidence of fabrication in the present proceeding and this, together with his stipulation that there was sufficient evidence to support the Board's suspension of his licenses, establishes that the licenses were justifiably suspended in August 1999. This being the case, Jones cannot show that he suffered harm as a result of the summary suspension of his licenses. Therefore, summary judgment should have been granted on the tort claims.
¶ 35 Summary judgment should also have been granted on the section 1983 claim because Mr. Jones fails to produce sufficient evidence to show a violation of a constitutional right. Although he claims that the individuals who inspected his pharmacy fabricated evidence of an emergency, and this led to summary suspension of his pharmacist and pharmacy licenses without an adequate predeprivation hearing, his claim of fabrication is supported only by self-serving, unsupported assertions, which are contradicted by his earlier declaration.

Analysis

Summary Judgment and Tort Claims
¶ 36 Mr. Jones has asserted claims for negligent supervision and tortious interference with a business expectancy. Both are premised on alleged wrongful suspension of his licenses. Respondents contend, and the Court of Appeals agreed, that these claims are barred by Jones's failure to exhaust administrative remedies. The majority, in contrast, concludes that Jones did exhaust administrative remedies.
¶ 37 There is no exhaustion question here in the usual sense, where exhaustion of administrative remedies is a necessary prelude to an appeal in court addressing issues that were decided in an administrative setting. Jones's section 1983 and tort claims were not before the administrative body. That body instead determined whether Jones committed violations of laws pertaining to pharmacies and pharmacists and the appropriate sanction for such violations. Exhaustion in its traditional sense clearly does not apply here.
¶ 38 However, the administrative proceedings are certainly relevant because they involve suspension of his licenses, which he contends caused the loss of his franchise and other harm. For two reasons, the administrative proceedings foreclose his state claims. First, on August 17, 1999, Jones received a copy of the ex parte order of summary suspension. The notice that Jones received informed him that he could contest the summary *837 action by written motion, but if he did, it would waive his right to a prompt hearing. On August 31, 1999, Jones filed a motion to modify and stay the summary suspension, thereby waiving the right to a prompt hearing.
¶ 39 Jones could have had a prompt hearing and a quick resolution of the issue whether his licenses should be suspended, but he elected not to do so. In addition, when Jones filed the motion to stay the summary suspensions, he was advised that he could give oral argument on the issue, but he declined. The motion to stay was decided by a full panel of the Board only 21 days after the ex parte order and on the basis of Mr. Jones's history of violations. The Board was concerned that Jones would not remain in compliance with requirements, as demonstrated by the December 1998 inspection that showed numerous violations, followed by the February inspection showing compliance, followed by the July and August inspections again showing numerous violationsmany of the same kind as occurred in December.[1]
¶ 40 This history of the administrative proceedings shows that Mr. Jones had opportunities to quickly resolve the matter of his license suspension, but did not take them.
¶ 41 Second, and more importantly because it is conclusive, the administrative proceedings show that as a matter of law Jones did not have a right to retain his licenses and the summary suspension was appropriate. He cannot, therefore, establish that loss of the licenses caused him harm.
¶ 42 Mr. Jones's pharmacist and pharmacy licenses were summarily suspended by an ex parte order because the Board determined that Jones operated the pharmacy in a manner below the standard of care for operation of a pharmacy in this state and "placed the patients of his pharmacy at serious risk of significant harm." Clerk's Papers (CP) at 323. Jones stipulated that the evidence was sufficient to support the Board's findings regarding numerous recurring violations, and he stipulated to the Board's conclusions of law that he violated numerous statutes and regulations governing the practice of pharmacy and the operation of pharmacies. Having done so, he agreed that he committed the violations justifying the suspension of his licenses. He also expressly stipulated that suspension of his licenses itself was justified.
¶ 43 Mr. Jones contends, however, that he is not really bound by the findings because they are preceded by the agreed-to statement that he did not admit to the conduct described. I do not believe that the stipulation is rendered wholly nugatory by this device, but it makes no difference. As explained at length below, Jones has not presented sufficient evidence to establish any genuine issue of material fact on the question whether the evidence of violations found by the inspectors was fabricated, other than his own self-serving statements that are inconsistent with his earlier testimony.[2] Since he does not show that the evidence was fabricated, and because he agreed the evidence was sufficient to support the facts, agreed to the conclusions, and agreed to the order of suspension, Mr. Jones cannot establish that the suspension of his licenses, which he claims caused the harm that he alleges, was wrongful or unjustified. He therefore should not be permitted to litigate issues that he has foreclosed through his own stipulations.
¶ 44 Whether this is viewed as a variant of the exhaustion doctrine or a form of estoppel or preclusion really is not the critical point. What matters is that Jones cannot show any genuine issue of material fact on causation, an element of each of his tort claims, because of his stipulations. Just as explained below in connection with the 1983 claims, Jones cannot create a material issue by contradicting the stipulations he made.
¶ 45 I would hold that summary judgment was improperly denied with regard to the negligent supervision and tortious interference claims.

Summary Judgment and Section 1983 Claims
¶ 46 I turn now to the more fact-intensive inquiry whether Jones raises any genuine *838 issue of material fact to preclude summary judgment on his section 1983 claim. Briefly stated, aside from Jones's own bald assertions of unprofessional conduct and weighted scores on the part of the inspectors and his own statements that violations did not occur, which are contradicted by his own testimony admitting violations, there is very little to this claim. But showing this to be the case necessarily involves close examination of the asserted facts.
¶ 47 The Board summarily suspended Mr. Jones's professional licenses after his pharmacy received failing scores in consecutive inspections at his pharmacy. Under RCW 18.130.050(7), WAC 246-869-190(8), and WAC 246-11-300, the Board can take emergency action and summarily suspend a pharmacist's license pending further disciplinary hearings if the Board determines that there is an immediate danger to the public health, safety, or welfare that can be addressed only by summary action. A suspension under these provisions takes effect upon entry of the order, but compliance with a summary action order is not required until the individual either is served with the order or has knowledge of it. WAC 246-11-310. The Board's summary suspension order was issued August 17, 1999, and later that same day the statement of charges and ex parte order of summary action was served on Mr. Jones. A notice for opportunity of settlement and hearing was served on Jones at the same time.
¶ 48 Jones alleges that he was deprived of his licenses without due process of law, contending that due process required a predeprivation hearing. Although he concedes that if summary suspension of his licenses was necessary in the face of a public emergency, then a predeprivation hearing was not a constitutional mandate, he contends that he has presented sufficient evidence that the individuals who inspected his pharmacy, Phyllis Wene and Stan Jeppesen, fabricated an emergency in order to justify the summary suspension.
¶ 49 Wene and Jeppesen maintain, however, that they are entitled to qualified immunity from suit under section 1983.[3]
¶ 50 A court may determine the issue of qualified immunity either by deciding whether the facts that the plaintiff alleges or shows make out a violation of a constitutional right or by deciding whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009). Thus, summary judgment is proper on the basis of qualified immunity if the plaintiff fails to produce sufficient evidence that a constitutional right has been violated, as is the case here.
¶ 51 Here, respondents presented sufficient evidence to support summary judgment on the ground that an emergency justified the summary suspension of Jones's licenses without a predeprivation hearing. However, the majority concludes that Mr. Jones, the adverse party, responded with sufficient facts to create a genuine issue of material fact on the issue whether the inspectors fabricated the evidence of an emergency that led to the summary suspension of Jones's licenses. Therefore, the majority concludes, summary *839 judgment on qualified immunity was properly denied. I strongly disagree.
¶ 52 Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." CR 56(c). CR 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here, the facts and reasonable inferences from the facts must be construed in Mr. Jones's favor as the nonmoving party. Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., P.L.L.C., 168 Wash.2d 421, 429, 228 P.3d 1260 (2010).
¶ 53 "A fact is an event, an occurrence, or something that exists in reality." Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988) (citing Webster's Third New International Dictionary 813 (1976)). "It is what took place, an act, an incident, a reality as distinguished from supposition or opinion." Id. (citing 35 C.J.S. Fact 489 (1960)). "`The `facts' required by CR 56(e) to defeat a summary judgment motion are evidentiary in nature. Ultimate facts or conclusions of fact are insufficient.'" Overton v. Consolidated Ins. Co., 145 Wash.2d 417, 430-31, 38 P.3d 322 (2002) (quoting Grimwood, 110 Wash.2d at 359, 753 P.2d 517).
¶ 54 Contrary to Mr. Jones's argument, and the majority's assessment of the facts, Mr. Jones has failed to produce sufficient evidence creating an issue of fact on whether the evidence of an emergency was fabricated. Mr. Jones relies heavily on his own declaration, submitted in opposition to the motion for summary judgment. A party is entitled to present a declaration or affidavit and set forth facts made on personal knowledge, but cannot merely state ultimate facts or make conclusory assertions and have them accepted at face value, as Mr. Jones has done. Moreover, as the respondents maintain, Mr. Jones has admitted to several of the violationsviolations that establish that the summary suspension of Jones's licenses was justified by an emergency situation. Further, many of the factual assertions in Jones's declaration submitted for purposes of the summary judgment ruling conflict with the facts he stated in his earlier declaration to the Board submitted in connection with a motion that he filed with the Board for a stay of the summary suspension.
¶ 55 Wene and Jeppesen inspected the pharmacy on July 12, 1999, and then, because the pharmacy received an unsatisfactory score (below a score of 80) they reinspected it on August 10, 1999. See WAC 246-869-190. Among the inspectors' findings at these inspections were that Jones failed to maintain adequate records that showed patient allergies and significant medical history; that his medical records system lacked the capability of producing an audit trail, i.e., showing materials and documents required for filling a prescription and changes made to the prescription record; that Jones could not produce written authorizations for customers to whom he dispensed prescription drugs in nonchild-resistant containers; that he had outdated prescription stock on his shelves; that Mr. Jones's inventory records for controlled substances were not complete and he could not locate all requested inventory records after being allowed extra time; and that there were several deficiencies in his record-keeping for controlled substances. Evidently Mr. Jones did not dispute that other violations occurred, for example, that he had prescription containers on his shelves displaying NDC (National Drug Code) numbers that did not match the drugs contained inside.
¶ 56 The record also includes relevant material concerning previous inspections of Mr. Jones's pharmacy. His pharmacy was inspected by Inspector Wene on December 17, 1998, and received an unsatisfactory score of 79. The record shows that a number of the same kind of violations reported following the July and August 1999 inspections had also been found during the December 1998 inspection. The pharmacy was reinspected on February 3, 1999, and received a passing score of 96.
¶ 57 In his petition for review and supplemental brief, Jones identifies the evidence *840 that he says demonstrates a material fact question about whether government officials reasonably believed that an emergency existed.
¶ 58 Initially, much of the "evidence" that Jones claims is sufficient to create a genuine issue of fact on fabrication of an emergency is his testimony about bad behavior, unprofessionalism, ill will, and improper motive on the part of the inspectors. However, evidence of unprofessional conduct or misbehavior on the part of the inspectors does not, in and of itself, create a question of fact as to fabrication. On the other hand, if there is evidence of fabrication that meets the requirements of CR 56(e), then evidence of unprofessional conduct and misbehavior could weigh in Mr. Jones's favor as tending to show reason for fabrication and thus adding to an inference from all the facts of fabrication.
¶ 59 I therefore turn first to the "evidence" that Mr. Jones presents on the question whether the inspectors fabricated an emergency. This involves a close look at the evidence submitted on summary judgment pertaining to the inspectors' findings of violations of statutes and rules regulating pharmacies and pharmacists.
¶ 60 Much of this evidence does not consist of evidentiary facts that may be considered in determining whether a material issue of fact exists. This includes Jones's testimony in the summary judgment declaration that in July and August 1999 his pharmacy was in better shape than it had been in February, when he received the score of 96; that since receiving his pharmacist's license he had worked at numerous pharmacies that were subjected to numerous inspections and his pharmacy in July and August was in greater compliance with pharmacy rules and regulations than many of those pharmacies, which received passing scores; and that in numerous instances the inspector deducted the maximum five points for minor discrepancies.
¶ 61 These conclusory statements of fact are not sufficient to create a genuine issue of material fact. Overton, 145 Wash.2d at 430, 38 P.3d 322; Grimwood, 110 Wash.2d at 359, 753 P.2d 517; Am. Linen Supply Co. v. Nursing Home Bldg. Corp., 15 Wash.App. 757, 767, 551 P.2d 1038 (1976). Jones presents no admissible facts in support of these statements. He does not present facts that show that the conditions in the other pharmacies were comparable to hisfor example, in the way that they kept records of patients' allergies or other relevant medical histories, the way they kept records of authorizations for dispensing prescriptions in non child-resistant containers, and so on, nor does he present facts regarding the scores they received. He simply makes a conclusory statement that his pharmacy was in greater compliance than others where he had worked.
¶ 62 His statement that his pharmacy was in better shape than in February is also an unsupported conclusory statement. Also, in this connection, although Jones complains that the July inspection was out of the ordinary because it occurred only five months after the February inspection, there appears to be nothing untoward about this timing. The February inspection was a reinspection following the pharmacy's failing score in December. As set forth in the amended statement of charges, the December 1998 violations included but were not limited to
[f]ailing to obtain chronic conditions on patients of the pharmacy; ... [d]ispensing the majority of prescriptions in non child-resistant containers without a written request from either the patient or the prescriber;... [v]arious required records required by state and federal law were either inaccurate, incomplete or not available;... [m]any of the prescriptions in the will call area had labeled expiration dates exceeding the manufacturer's expiration date; ... [m]ost of the prescriptions in the will call area contained the incorrect NDC number for the product in the prescription container.
CP at 362. Thus, as it turned out, in fact many of the violations found in the July and August inspections were the same type of violations that had occurred in December providing some confirmation of the need for continuing to inspect pharmacies with a history of noncompliance.
¶ 63 Next, Jones's "evidence" about being assessed the maximum points for minor deficiencies *841 identifies none of the deficiencies to which he refers and he produces no evidence regarding what might have been a more usual or reasonable or normal point deduction. Again, Jones simply makes a conclusory statement without evidentiary facts to support it.
¶ 64 Jones next maintains that contrary to inspection reports, his prescriptions were in sequential order and if any were missing he believed they had been taken by a former employee, whom he fired for misconduct and who, he claims, was an anonymous informant for the state. With regard to the allegation about employee theft, there are no evidentiary facts whatsoever in support of this assertion. His claims about the fired employee are speculative. The nonmoving party "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 13, 721 P.2d 1 (1986). If Jones's claim that missing prescriptions had been stolen has any basis in fact, Mr. Jones has not provided evidence to this effect.
¶ 65 As to record-keeping deficiencies with regard to prescription inventories, pharmacists are required to keep detailed records of all quantities of controlled substances bought and sold, and an inventory must be performed every two years. 21 U.S.C. § 827. In the report following the July inspection, Inspector Jeppesen stated that Jones's inventory records were incomplete and Jones could not locate the records even after being allowed an extra day to do so. The August report stated that there were numerous holes in the prescription files, with 21 missing from two consecutive days. Although Jones claims that his pharmacy inventory records were in sequential order, this assertion in the summary judgment declaration is inconsistent with his earlier declaration to the Board in connection with his motion to stay his license suspension. There, he admitted that he was missing prescription records at the time of the August inspection, acknowledging that he had an employee spend a week to go through the files and saying that some prescription records could not be located because they had been misfiled. He admitted in the summary judgment declaration that there were additional missing prescriptions that he could not locate, but, as discussed above, blames their absences on the former employee.
¶ 66 Jones also relies on his testimony in the summary judgment declaration as creating issues of fact with regard to other violations. As with the statements about missing prescriptions, a great deal of this "evidence" contradicts statements in his declaration to the Board.
¶ 67 Self-serving affidavits contradicting prior sworn testimony cannot be used to create an issue of material fact. Overton, 145 Wash.2d at 429-31, 38 P.3d 322; McCormick v. Lake Wash. Sch. Dist., 99 Wash.App. 107, 111, 992 P.2d 511 (1999). "`When a party has given clear answers to unambiguous... questions [in a deposition] which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" Marshall v. AC & S Inc., 56 Wash.App. 181, 185, 782 P.2d 1107 (1989) (quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir.1984)); accord, e.g., Robinson v. Avis Rent A Car Sys., Inc., 106 Wash.App. 104, 122, 22 P.3d 818 (2001); Unigard Ins. Co. v. Leven, 97 Wash.App. 417, 430-31, 983 P.2d 1155 (1999). The two statements must be clearly contradictory. Berry v. Crown Cork & Seal Co., 103 Wash.App. 312, 322-23, 14 P.3d 789 (2000).[4]
*842 ¶ 68 Contrary to Jones's assertions in his answer and supplemental brief, the admissions that he made confirm that the violations occurred and that there is no genuine issue of fact regarding alleged fabrication of evidence of any emergency.
¶ 69 First, Jones refers to the testimony in his declaration in opposition to summary judgment for evidence that contrary to the July inspection report he had entered allergy and chronic disease information about his customers, but unknown to him the computer program he used recorded the information but did not process it; that after that inspection he contacted officials in connection with his computer system and they turned on the part of the program that processed medical conditions; that he did have written records of patients' requests for nonchild-resistant caps; that he had a regular process for checking outdated medications; that he did not have 38 outdated items on the shelves at the time of the July inspection and had no outdated items on his shelves after the August inspection; that he had matched Federal Food and Drug Administration (DEA) order forms with invoices; and that he had performed the inventory of Schedule II and Schedule III drugs before the August reinspection.
¶ 70 This evidence does not create a material issue of fact. With regard to patients' medical conditions and histories, Inspector Jeppesen stated in his report of the July 1999 inspection that during approximately four hours of observing Jones process prescriptions, the computer medical records system used (QS-1) did not demonstrate an alert for allergy, therapeutic duplication, disease state interactions, or any other warning. CP at 284. In his August 1999 inspection report, Jeppesen stated that there were
six patients noted in computer system with no allergy information. 2 of 5 patients without disease state data. Drug-disease state interaction module has been turned off. Pharmacist without knowledge of meaning of drug-drug interaction levels or how to find definitions or meanings. Pt. profile do [sic] not reflect what the patient actually received.
Id. at 288.
¶ 71 Jones said in his summary judgment declaration that contrary to the inspection report, he did enter allergy and chronic disease information into his computer record, but unknown to him the system was recording the information but not processing it. He said that "[t]his was corrected by the second inspection." Id. at 767. In his declaration to the Board, Jones said that although information about allergies and chronic conditions had always been obtained from patients, there was a
question as to whether it was being properly inputted into the computer. Further, the disease state-drug interaction fields were thought (by the inspectors) to have been turned off. Therefore, while the inspectors were at lunch on August 10th, I contacted my computer vender to discuss these problems. I was informed, much to my surprise, that these features were left off by the company (i.e., never turned on by them), unless they were specifically requested to do so.... [T]his function was operational by the time [the inspectors] returned from lunch.
Id. at 341.
¶ 72 Jones's own declaration confirms the inspector's report that the computer system was not processing and thus not alerting Jones or anyone else at the pharmacy of any allergies, drug interactions, therapeutic duplications, etc. Moreover, although Jones said in his summary judgment declaration that this was corrected "by" the second inspection, this statement directly contradicts his earlier declaration to the Board where he stated that during the time the inspectors were at lunch on August 10, 1999, the date of the reinspection, he contacted the computer vendor and only then learned that his system was not processing the necessary information because the feature was "off."
¶ 73 In the face of a failing inspection score and the inspection report stating that he was not accessing disease state, drug interaction, *843 and other vital information, Jones, by his own account, did not make an effort to resolve this issue until the same matter came up during the reinspection.
¶ 74 Next, in the inspection report for July 1999, Inspector Jeppesen stated that when Mr. Jones was asked about his computer system, after "a number of verbal transactions" it was determined that the system could change prescription data without an audit trail to track changes. Id. at 284. Jeppesen reported that Jones's computer system did "not have the ability to track changes made to the prescription record. No tracking for audit purposes possible." Id. at 289.
¶ 75 Jones said in his declaration to the Board that
the inspectors were concerned that our QS-1 system was inadequate for the minimum procedures for utilization of the patient medication system and for creating an accurate and complete audit trail for changes made to the prescriptions after filling.... I have spoken with the QS-1 technical support personnel, the system is fully capable of performing these functions, and I am able to utilize these functions.... I would gladly show an inspector how it is done."
Id. at 344. This declaration shows that the QS-1 system was capable of making audit trails but that Jones had to learn this from the vendor's support personnel, and his declaration to the Board shows this occurred after the first inspection. This declaration sufficiently shows that the system was capable of creating audit trials, contrary to the inspector's report, but it also shows that Jones did not know how to demonstrate this to the inspectors. In effect, whether the system was capable of being operated was one thing, but whether it was operable was another, and Jones's own declaration shows that he had to learn the system from the technical support personnel after the July inspection occurred and he did not have the system on before that or know how to use it.
¶ 76 Another major problem identified by the inspection reports was the lack of written authorizations from patients permitting Jones to dispense prescriptions in nonchild-resistant containers. WAC 246-869-230 requires that legend drugs be dispensed in a child-resistant container unless an appropriate authorization is received by the pharmacist. The Federal Poison Prevention Packaging Act and accompanying regulations has similar requirements. 15 U.S.C. §§ 1471-1476; 16 C.F.R. § 1700.5.
¶ 77 Inspector Jeppesen stated in his report following the July inspection that Jones could not locate patient authorizations for many customers to whom he had dispensed prescription drugs in containers that were not child resistant, noting that the "blue three ring binder where [Mr. Jones] had patients sign for authorization to have non-safety caps dispensed ... is divided into alphabetic sections, with several to many pages of signatures listed down each page, on both sides. Many signatures are difficult to impossible to read, and are not in alphabetic order within the section." CP at 283. When Jones was requested to find authorizations for seven patients with last names beginning with "B," the report states, Jones could locate only two of the authorizing signatures. Id. Following the August reinspection, Jeppesen's report said that there were 41 prescriptions on Jones's will-call shelf and only one had a child-resistant container. The one container had been supplied by the drug manufacturer.
¶ 78 In his declaration to the Board, Jones admitted that his patient authorizations "may not have been organized for ease of reference," id. at 342, and his attorney said in a declaration to the Board that Jones's "record-keeping system for the signatures did not allow for one to readily verify specific signatures." Id. at 349.
¶ 79 Jones himself acknowledged that his records were not organized for ease of reference, and this confirms that he did not have a system designed for verifying who had authorized prescriptions dispensed in nonchild-resistant containers.
¶ 80 Another area where Jones's pharmacy was marked down concerned outdated/deteriorated stock. The DEA requires that drugs be assigned expiration dates designed to co-ordinate *844 with drug stability. 21 U.S.C. § 321; 21 C.F.R. § 211.166.
¶ 81 Inspector Jeppesen's report following the July 1999 inspection states that 38 items in Jones's prescription stock area were outdated. Following the August reinspection, Jeppesen's report noted that 11 items on Jones's shelves and in his refrigerator in the pharmacy were outdated.
¶ 82 In his declaration to the Board, which was dated August 27, 1999, Jones stated:
All outdated legend and OTC [(over the counter) ] products have been removed from my shelves. In order to avoid any problems with this in the future, we will now do a monthly review instead of quarterly, for outdates. This will ensure that no outdates remain on the shelves. I also had "Returns by Howard" come out, inspect for outdates, too, and process our returns.
CP at 343. Jones's attorney said in his declaration that some of these outdated items had "slipped through the cracks." Id. at 350.
¶ 83 This declaration establishes that Jones did have outdated items on the shelves because he stated that he had removed them, that he did quarterly rather than monthly reviews, and that he believed that a new system would resolve the problems he had had with outdated materials on the shelves.
¶ 84 In his summary judgment declaration, however, Jones stated: "I had a regular process for checking outdated medications and did not have 38 outdated items on the shelves." Id. at 767.
¶ 85 His "regular process" was, according to his earlier declaration, a quarterly review rather than monthly, which he then decided to replace with a monthly review. His declarations together establish that he did have outdated items (though he evidently disputes they totaled 38 items) and that he had to alter his review process to assure that out-dated items were removed in a timely fashion.
¶ 86 Finally, there are special requirements for keeping records of Schedule II drugs, such as morphine, cocaine, and methamphetamine. The Schedule II inventory records must be kept separately from other records, and DEA order forms must be prepared and executed by the dispensing pharmacist and kept for two years. 21 U.S.C. § 827(b); 21 C.F.R. § 1305.06, .13. WAC 246-887-020 implements these requirements in this state.
¶ 87 Jeppesen's report following the July inspection stated that Jones could not find Schedule II records and that after being allowed an additional day, Jones still could not locate them. After the August inspection, the report stated that the DEA forms were not complete, that the Schedule II inventory was not signed as required, that Schedule II invoices were filed with general invoice records rather than separately, and that a required DEA number was not on the Schedule II inventory.
¶ 88 In his declaration submitted to the Board, Jones admitted that some DEA forms were missing, stating that one order had not been received, another had been lost between the pharmacy and the wholesaler, and that a third order "had not been checked in yet." CP at 344. He stated that he subsequently prepared the third form and described a new procedure for keeping invoices with DEA forms. Although Jones offered these various explanations, he did not dispute that these forms were missing or incomplete.
¶ 89 In light of Jones's admissions in the declaration to the Board, the inconsistencies between this declaration and the declaration that he submitted for purposes of the summary judgment motion, and his failure to present actual evidentiary facts in support of his many conclusory statements of ultimate fact in this self-serving declaration,[5] he has *845 not shown a genuine issue of material fact on the question whether the inspectors fabricated evidence of the violations they found.
¶ 90 As the Court of Appeals recognized, cases demonstrate that the violations that occurred here can cause serious harm. For example, in Wahba v. H & N Prescription Ctr., Inc., 539 F.Supp. 352 (E.D.N.Y.1982), a two-year-old died after ingesting his mother's prescription pills that were dispensed in a container lacking a child-resistant cap. In Baker v. Arbor Drugs, Inc., 215 Mich.App. 198, 544 N.W.2d 727 (1996), a pharmacy patient suffered a stroke after a pharmacist filled prescriptions for incompatible drugs because the pharmacist failed to properly use a computer system that would have warned of the danger of the drug interactions.
¶ 91 Under the circumstances of this case, there is no genuine issue of material fact as to whether evidence of the violations found by Wene and Jeppesen was fabricated.
¶ 92 The majority believes, however, that Inspectors Wene's and Jeppesen's assignment of lower inspection scores in July and August 1999 than upon inspections in December 1998 and February 1999 and the "lack of apparent reasons for the change" are facts[6] that could lead a reasonable juror to believe that Wene and Jeppesen fabricated an emergency. Majority at 833-34. It is difficult to respond to this conclusion because it is so inconsistent with the facts of this case.
¶ 93 Mr. Jones violated numerous state and federal statutes and regulations as found in December 1998. These laws are not concerned merely with keeping paperwork up to date and ministerial tasks. They are laws that provide necessary protection to patients who obtain prescription drugs. Matters of life and health are, quite literally, at stake. They also concern proper record-keeping and tracking for controlled substances.
¶ 94 After the December 1998 inspection, Mr. Jones improved his practicestemporarilybut then reverted to his former practices, with his patients' lives and health again at risk. He literally was not accessing any information about patients' disease states, allergies, and drug interactions until he finally asked for assistance from his computer vendor on August 17, 1999 while the inspectors were at lunch. One can legitimately ask how a pharmacist could fail to realize that he was not seeing such information in his computer records, but the fact, and it is incontrovertible, is that he was not accessing this information.
¶ 95 He did not properly label drugs, he had outdated items on his shelveseven upon the reinspection in August, and he could not locate authorizations for child proof caps for the majority of the patients for whom he was asked to retrieve this information. His records of controlled substances were not in order.
¶ 96 The record itself shows why, if they were in fact given,[7] lower scores were justified. Mr. Jones was, quite simply, a "repeat offender." Despite earlier inspections and earlier attempts to improve his manner of operating his pharmacy, his repeated and numerous violations again put countless patients at risk.
¶ 97 But the bottom line is that the difference in scores makes no difference because the difference in scores does not create a genuine issue of material fact about fabrication of an emergency. The record of the actual violations that put patients at high risk, of which Mr. Jones's own statements *846 and stipulations are a significant part, establish without any question whatsoever that an emergency existed.[8]
¶ 98 This being the case, Jones's assertions that the inspectors engaged in unprofessional behavior are irrelevant. Because fabrication is necessary to Jones's claim that a constitutional violation occurred as a result of being denied a predeprivation hearing, Jones has not presented sufficient evidence to show a genuine issue of material fact on the issue whether there was a violation of a constitutional right. And as mentioned, he concedes that if there was an emergency, then a predeprivation hearing was not required by due process.

Conclusion
¶ 99 Mr. Jones stipulated that there was sufficient evidence to support the stipulated findings of fact in the Board's decision, and he stipulated that these facts establish many violations of statutes and administrative regulations governing pharmacists and pharmacies. Jones stipulated that suspension of his licenses was justified. In addition, Mr. Jones has not established that any genuine issue of material fact exists as to whether the individuals inspecting his pharmacy fabricated the evidence that he committed the violations. Instead, the claim of fabrication is supported only by self-serving, unsupported assertions in the declaration he submitted for summary judgment purposes. These assertions are, in key respects, also contradicted by his earlier declaration submitted to the Board in connection with his motion to stay the summary suspension of his licenses.
¶ 100 Since he has not raised a genuine issue as to whether the evidence was fabricated, and he agreed it was sufficient to support the findings of fact, agreed to the conclusions, and agreed to the order of suspension, Mr. Jones cannot establish that the suspension of his licenses was wrongful or unjustified. It follows that he cannot show that he suffered harm as a result of the summary suspension of his licenses; he cannot establish the causation elements of his tort claims. Accordingly, summary judgment in favor of respondents was proper with respect to Mr. Jones's tort claims.
¶ 101 In addition, because he has failed to produce sufficient evidence of fabrication, Mr. Jones has not produced sufficient evidence of a violation of a constitutional right. Summary judgment was therefore properly granted in favor of the respondents on Jones's section 1983 claim.
¶ 102 I would affirm the grant of summary judgment in favor of the respondents and accordingly dissent from the majority opinion.
WE CONCUR: GERRY L. ALEXANDER, SUSAN OWENS, and JAMES M. JOHNSON, Justices.
NOTES
[1] Because this case comes to us on an order for summary judgment, we set forth the facts and the reasonable inferences from them in the light most favorable to the nonmoving partyJones. Bishop v. Miche, 137 Wash.2d 518, 523, 973 P.2d 465 (1999).
[2] Unfortunately, the inspection reports from December 1998 and February 1999 were not included in the appellate record. However, the stipulated findings of fact from Jones' agreed order with the Board contains a summary of their findings. Our quotations related to these first two reports are from the stipulations.
[3] RCW 18.130.050(8) has since been amended to require the Board to hold a show cause hearing "[w]ithin fourteen days of a request by the affected license holder." Laws of 2008, ch. 134, § 3. At the time, however, the statute included no such requirement.
[4] We use "State" to refer to the remaining defendants collectively.
[5] When an independent decision maker intervenes between the first wrongful act and the ultimate deprivation of the constitutional right, as in this case, the chain of causation is not broken "where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an `independent' decision that results in a deprivation of liberty" or property. Zahrey, 221 F.3d at 352; see also Wilmore, 407 F.3d at 283 (holding an investigating officer is liable under § 1983 for the "reasonably foreseeable result of [the] initial act of fabrication"). However, as the Second Circuit notes, "[t]he initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, `but for' causation could be claimed to be lacking." Zahrey, 221 F.3d at 352 n. 8.
[6] The dissent incorrectly states the issue as "whether the inspectors fabricated evidence of the violations they found." Dissent at 22. Jones does not argue that all evidence of violations was fabricated, and the record would not support such a claim. In fact, Jones concedes that the later agreed order complied with due process: "Jones's § 1983 claim is not based on the fact that the Board of Pharmacy ultimately suspended his licenses; Jones's § 1983 claim is based on the fact that his licenses were suspended ex partewithout notice and an opportunity to be heard." Pet. for Review at 11. Thus Jones' § 1983 claim against Wene and Jeppesen centers on their role in fabricating an emergency. If Williams and the Board had provided predeprivation procedures to Jones, this could have been a different case.
[7] In the stipulated findings of fact, conclusions of law, and agreed order, Jones "acknowledge[d] that the evidence is sufficient to justify" the findings for which his license was suspended. PCP at 415. But he expressly did not "admit to the... conduct." Id. If the stipulations had been drafted differently such that he admitted to the violations and their sufficiency as a basis for suspending his licenses, then this case might be dramatically different.

The dissent dismisses Jones' declaration as "self-serving" and containing "conclusory statements of ultimate fact." Dissent at 22. However, the rule is settled that "[t]he court does not weigh credibility in deciding a motion for summary judgment." 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 25:16 (2009). Thus, a court must not weigh the veracity of a declaration simply because it is "self-serving." The dissent's analysis would usurp the role of the jury, and plaintiffs whose claims depend on their own version of events would no longer be able to rely on their own declarations. Plaintiffs would be unable to withstand motions for summary judgment, because their declarations would be disregarded as "self-serving."
The dissent also argues that Jones' declaration contains only conclusory statements and therefore does not present evidence about the condition of his pharmacy in February 1999 or that the inspectors' point deductions were for minor discrepancies. See dissent at 11-12. The dissent misstates the meaning of a conclusory statement or ultimate fact. For example, the statement "Wene and Jeppesen violated my right to due process" is a conclusion. Cf. Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 360-61, 753 P.2d 517 (1988) (holding that a plaintiff's bare allegation of age discrimination was a conclusion). The statement that Jones' pharmacy was in better condition in July than in February is not conclusory. It is a specific fact. The dissent cannot apply the label "conclusory" to every fact that it finds inconvenient.
[8] The State and dissent go beyond the exhaustion issue presented for our review and argue that the administrative process severed the causal connection between the actions of Wene and Jeppesen and Jones' injuries. The State, citing Tyner v. Department of Social & Health Services, 141 Wash.2d 68, 88, 1 P.3d 1148 (2000), argues in its supplemental brief that the Board's independent decisions to summarily suspend Jones' licenses and then enter the agreed order broke the chain of causation. The State and the dissent further argue, based on City of Seattle v. Blume, 134 Wash.2d 243, 947 P.2d 223 (1997), that Jones' actions during the administrative process prevent him from establishing legal causation. Critically, however, the Court of Appeals did not consider causation, and neither Jones' petition for review nor the State's answer addressed it. The scope of our review is limited, and we choose not to address causation because it was raised for the first time in the State's supplemental brief and in the dissent. See RAP 13.7(b).
[1] The nature of the violations in December 1998 and July and August 1999 is set out in detail below in connection with the section 1983 claim.
[2] The inconsistencies are addressed in detail below.
[3] Government officials performing discretionary functions are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Because qualified immunity is `an immunity from suit rather than a mere defense to liability ... it is effectively lost if the case is erroneously permitted to go to trial.'" Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The United States Supreme Court has "`repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). Indeed, the Court said in Harlow that the standard of "objective reasonableness of an official's conduct, as measured by reference to clearly established law" should "permit the resolution of many insubstantial claims on summary judgment." Harlow, 457 U.S. at 818, 102 S.Ct. 2727; see also Johnson v. Fankell, 520 U.S. 911, 915, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997).

The Court of Appeals held that the Board's executive director, Donald Williams, was absolutely immune from suit under section 1983, and Jones has not challenged this holding.
[4] Along similar lines, the respondents contend that the doctrine of judicial estoppel bars consideration of conflicting statements in the later summary judgment declaration to create a material issue of fact. Judicial estoppel bars a party from asserting one position in one judicial proceeding and in a subsequent proceeding taking an inconsistent position to gain an advantage. Ashmore v. Estate of Duff, 165 Wash.2d 948, 951-52, 205 P.3d 111 (2009); Arkison v. Ethan Allen, Inc., 160 Wash.2d 535, 538, 160 P.3d 13 (2007). Although there is no exhaustive formula, the principle inquiries are whether the later position is clearly inconsistent with the first, whether acceptance of the later position would be construed as showing that the court in one or the other of the proceedings was misled, and whether the party would obtain an unfair advantage or the opposing party an unfair detriment if estoppel is not applied. Ashmore, 165 Wash.2d at 951-52, 205 P.3d 111; Arkison, 160 Wash.2d at 538-39, 160 P.3d 13.
[5] The majority objects to my calling Jones's statements self-serving, claiming that we cannot consider the self-serving nature of a declaration because it involves credibility. Majority at 834 n. 7. Our case law is directly to the contrary. Where statements directly contradict earlier sworn testimony, we can dismiss them as self-serving and can do so in the context of a summary judgment motion. Overton, 145 Wash.2d at 429-31, 38 P.3d 322. The majority also objects to my characterization as "conclusory" Jones's statement that his pharmacy was in better condition at the time of the July and August inspections than it had been in February 1999. Majority at 834 n. 7. That statement says nothing about what the condition was, or how in any factual way it was better. Facts are insufficient to defeat summary judgment when they are "`[u]ltimate facts or conclusions of fact.'" Overton, 145 Wash.2d at 430-31, 38 P.3d 322 (quoting Grimwood, 110 Wash.2d at 359, 753 P.2d 517).
[6] The majority says that other facts that support this conclusion are the inspectors' aggressive behavior and Jones's claims that many of the violations were not as bad as the inspection reports claimed. As I explain, Jones's assertions about aggressive behavior are not material under the facts of this case and his assertions that violations were not as bad as claimed is belied by his stipulations and his own contradictory statements.
[7] The record does not permit an across the board comparison of scores because the record does not contain detailed information about the scores for any of the inspections. It is speculative to conclude that Mr. Jones was given lower scores for the same misconduct.
[8] Nothing in Jones's own statements and stipulations was fabricated by Wene and Jeppesen.