14 P.3d 789 (2000)
103 Wash.App. 312
Betty M. BERRY, for herself, and Joyce Perry, as Personal Representative for the Estate of James D. Berry, deceased, Appellants,
v.
CROWN CORK & SEAL COMPANY, INC., Defendant, and
Saberhagen Holdings, Inc., Respondent.
No. 44546-4-I.
Court of Appeals of Washington, Division 1.
July 17, 2000.
Publication Ordered September 20, 2000.
As Amended November 17, 2000.
*790 William J. Rutzick, Schroeter, Goldmark & Bender, Seattle, for Appellants.
Timothy K. Thorson, Seattle, for Respondent.
ELLINGTON, J.
James Berry worked at the Puget Sound Naval Shipyard in 1942 and from 1945 to 1950. He died of mesothelioma, which is caused by exposure to asbestos products. His estate and surviving spouse sued Saberhagen Holdings, Inc., alleging that its predecessor, Charles R. Brower Company, supplied the asbestos-containing products to the shipyard. The trial court granted Saberhagen's motion for summary judgment on the basis that the evidence on which plaintiffs relieda 1984 affidavit, 1984 deposition, and 1993 trial testimony, each provided by the same fact witnessclearly contradicted each other. We hold that the evidence, while arguably inconsistent, did not meet the "clear contradiction" standard set forth under the Marshall[1] rule, and that the plaintiffs presented sufficient evidence to raise a genuine issue of material fact as to whether Berry was exposed to Brower products at the shipyard. Accordingly, we reverse the trial court's grant of summary judgment in favor of Saberhagen and remand the case for trial.

Facts
Mesothelioma is a cancer in the lining of the lung caused by asbestos exposure. James Berry's estate and surviving spouse sought damages from Saberhagen Holdings, Inc. (Saberhagen) on the basis that Berry contracted the disease because he was exposed to asbestos-containing products while employed at the Puget Sound Naval Shipyard (PSNS). The plaintiffs[2] alleged that Saberhagen's predecessor, Charles R. Brower Company (Brower), distributed the asbestos-containing products to PSNS.
On summary judgment, the trial court dismissed the plaintiffs' claims against Saberhagen, concluding that there was insufficient evidence to raise a genuine issue of material fact that Berry had ever been exposed at PSNS to asbestos-containing products supplied by Brower. The parties presented the following evidence at summary judgment.
Evidence of Brower Products at PSNS
Al Lede
The principal source of evidence regarding the presence of Brower-supplied asbestos-containing products at PSNS was the testimony of Al Lede, which was given in unrelated litigation. Lede worked at PSNS from 1939 through 1944 and again from 1946 to 1951. Lede's evidence took three forms: (1) an affidavit dated August 31, 1984; (2) a deposition taken the same day, August 31, 1984; and (3) trial testimony given on March 24, 1993. Because of the centrality of Lede's evidence in this appeal, we quote in part from each source of testimony.
In his 1984 affidavit, Lede stated that he was employed as a purchasing agent from 1942 to 1944, and became a purchasing supervisor when he returned to PSNS in 1946. Lede explained:
My duties included either purchasing or supervising the purchasing of asbestos-containing thermal insulation products for use at the Navy Yard. My recollection is that when thermal insulation products were purchased at least 50% of the products were purchased from local sources in the Seattle area, such as the Brower Company or E.J. Bartells. In these cases our purchases were made directly from these local commercial outlets rather than from the manufacturers. Many of these purchases were made orally over the telephone.
*791 In his 1984 deposition, Lede was asked about the procurement of thermal insulation products at PSNS:
Q: During this period of time between 1939 and 1943 when you were drafted, during any of the times that you held any of the positions that you have just discussed did you deal at all with procurement of thermal insulation products?
A: Yes, to some degree. It was merely one item out of a whole variety of others that we procured.
Q: Do you recall, sir, whether or not you dealt specifically with asbestos thermal insulation products?
A: We did have two items that I recall from memory. That was the pipe covering and the plain sheets of asbestos that we did procure from time to time.
Q: Do you recall from whom you procured this pipe covering?
A: There were two major suppliers that got so much of the business that I can recall them very well. One of them was Johns-Manville themselves and the other was E.J. Bartell which is a local dealer or jobber here in the Seattle area. There were others that may have occasionally gotten a smattering of business but they were the major ones.
Finally, Lede testified at a 1993 trial about the procurement of asbestos-containing material at PSNS between 1949 and 1951:
Q: Did you from time to time have occasion to purchase asbestos-containing materials for use on ships during the time period 1949 to 1951?
A: Yes.
Q: Okay. Did you on occasion purchase from local distributors in the Puget Sound area asbestos-containing insulation materials?
A: Yes.
Q: Okay. And can you recall the names of any of those distributors?
A: Yes. There was Asbestos Supply Company and Pioneer Sand & Gravel, Charles R. Brewer [sic], and E.J. Bartells were the main ones that I can remember.
. . . .
Q: Okay. Can you describe the kind of circumstances when you would buy from local distributors?
A: Well, the circumstances, usually in the shipyard, was that everything was wanted yesterday, and consequently we always resorted to the local trade area to find the stock that was available. And in my particular unit we rarely ever ventured out of the Seattle-Tacoma area for our supplies.
Q: Okay. But just so something is clear. The main supplies of asbestos insulation materials were bought from the manufacturers. Is that correct?
A: That is correct.
Q: Okay. How frequent was it that you bought from, if you can recall, from local distributors?
A: Well, local distributors were always used for the smaller amounts and the ones that were needed almost immediately, and of course asbestos products was really a minor portion of the shipyard's materials that we bought. So the frequency of buying was infrequent.
Q: Okay. An occasional, was it an occasional basis?
A: Yes, ma'am.
Charles Downey & Ben Bradley
Information regarding the presence of Brower-supplied asbestos-containing products at PSNS also came from Charles Downey and Benjamin Bradley. Downey worked as an insulator at PSNS from 1941-1948. He testified that Philip Carey (Carey) and Plant Rubber & Asbestos (Plant) products were commonly used on ships being repaired at PSNS. When asked where PSNS obtained the asbestos products, he responded, "Well, they obtained a lot of them right from Seattle, to the companies here in Seattle. Also, I suppose you had some shipped in."
Bradley worked as an insulator in the Seattle area during the 1940s. In 1988 trial testimony, Bradley stated that Brower had been a distributor for Plant and Carey products.
*792 Evidence of Berry's Exposure to Asbestos Products
Berry worked as a machinist at PSNS in 1942 and again from 1945 to 1950. He worked aboard a number of ships, including the Nevada and Saratoga, for most of these periods, and worked around insulators who used insulation materials that created substantial amounts of dust.
Dr. Jerry Riehl, a chemist, stated in a 1983 affidavit that because asbestos dust had the ability to drift, an asbestos product used in one part of a ship could expose "workers in vast areas in a shipyard." Dr. Dorsett Smith, a pulmonary physician, similarly stated in a 1983 affidavit that an individual who did not work aboard a ship could still be exposed to asbestos by working in the shipyard.
Dr. Samuel Hammar, a pathologist, concluded in a 1997 letter that Berry's mesothelioma was caused by asbestos. Dr. Andrew Churg, another pathologist, explained that all of Berry's exposure to asbestos caused the mesothelioma. Finally, plaintiffs submitted a declaration from Dr. Nicholas Heyer, an industrial hygienist and epidemiologist, who stated that Berry's exposure to asbestos while working aboard the ships at PSNS was a very likely cause of his mesothelioma.

Discussion
A. Standard of Review
In reviewing a summary judgment order, we engage in the same inquiry as the trial court. Friend v. Friend, 92 Wash.App. 799, 802, 964 P.2d 1219 (1998), review denied, 137 Wash.2d 1030, 980 P.2d 1283 (1999). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c).
B. Abandonment of Post-World War II Claims
Before reviewing the evidence of Berry's exposure to Brower asbestos products, we must determine the appropriate time period during which Berry claims he was exposed. Saberhagen asserts that at summary judgment, plaintiffs abandoned any claims of post-World War II exposure by focusing solely on Berry's exposure in 1942, and therefore plaintiffs should not be permitted to resurrect such claims on appeal. Our reading of the record does not support Saberhagen's assertion.
In its motion for summary judgment, Saberhagen summarized the plaintiffs' claim as encompassing Berry's work at PSNS in 1941-42 and 1945-50. Saberhagen argued that plaintiffs' evidence did not satisfy the Lockwood[3] factors, and in particular that plaintiffs could provide "no evidence that Brower ever supplied insulation to any of the ships that Mr. Berry ever worked on ... at PSNS (1941-42, 1945-50)."
In opposing Saberhagen's motion, the plaintiffs focused their argument on Berry's exposure during World War II, but did not do so unequivocally. Plaintiffs relied on evidence referencing the combined tenure of Berry's work at PSNS. Dr. Heyer's declaration, for example, summarized Berry's exposure during both periods, and concluded that his exposure while working aboard ships at PSNS was a likely cause of his mesothelioma.
At oral argument, both parties again concentrated on 1942, because during that time Berry worked on two specific ships. Plaintiffs' counsel, for instance, stated:
My argument is, for Summary Judgment purposes, it is a material disputed issue of fact as to whether or not the Saberhagen products ... were on the Nevada and the Saratoga.
But even assuming that they weren't on the Nevada or the Saratoga, they were by all discussion, ... they were at the shipyard in this time period, and that the Brower products being at the shipyard in 1942 suffices to defeat Summary Judgment.
But counsel for the plaintiffs also pointed to evidence that encompassed the post-World War II time period, including Lede's 1993 *793 trial testimony identifying Brower as a local distributor between 1949 and 1951. Later, plaintiffs stated:
Now, let me just go through this, the workplace exposure and what Ithese are the Lockwood criteria. They are my characterization of them, but I submit they are a fair characterization of the factors that the Lockwood case talked about.
And they bear some considerable relationship to what Mr. Thorson [Saberhagen's counsel] said, so workplace exposure, the issue here is Mr. Berry says I worked at P.S.N.S. for most of 1942, and then I came back, he says in '46 to '50 or thereabouts.
Saberhagen asks us to consider the tenor of oral argument only, claiming that plaintiffs' ability to survive summary judgment hinged on their ability to prove that in 1942, Berry was exposed to asbestos either on the Saratoga or Nevada or in the shipyard generally. We find, however, that plaintiffs did submit and/or identify other pieces of evidence referencing post-World War II exposure, even though it may have been in the context of the 1942 debate. Plaintiffs therefore did not abandon claims of post-war exposure merely by concentrating on what they may have perceived to be the focus of Saberhagen's motionBerry's exposure to asbestos while he worked on the Nevada and Saratoga in 1942.
Each of the cases on which Saberhagen relies in support of its waiver argument is distinguishable. See Knipschield v. C-J Recreation, Inc., 74 Wash.App. 212, 216 n. 4, 872 P.2d 1102 (1994) (declining to consider appellant's claim that Idaho law applied because appellant never raised or argued the applicability of Idaho law before the trial court); Concerned Coupeville Citizens v. Town of Coupeville, 62 Wash.App. 408, 413, 814 P.2d 243 (1991) (declining to consider argument not raised at trial below); Wetherbee v. Gary, 62 Wash.2d 123, 128, 381 P.2d 237 (1963) (declining to consider sufficiency of legal description for tract of land because counsel stipulated below that it was not an issue). Here, Saberhagen does not argue that plaintiffs never raised a post-World War II claim, and there is little indication plaintiffs affirmatively abandoned or waived the claim. Accordingly, we reject Saberhagen's argument and consider the evidence as applied to both time periods.
C. Lede's Testimony and the Marshall Rule
The trial court determined that Lede's 1984 affidavit contradicted his 1984 deposition and 1993 trial testimony under the Marshall[4] rule, and excluded all three sources of evidence from consideration. Appellants argue that because the three pieces of evidence refer to different time periods and were not clearly contradictory, they should have been considered below. We agree with appellants.
In Marshall, the plaintiff stated in deposition testimony that he learned he had asbestosis in 1982, but in a later affidavit, he stated that the asbestosis was not diagnosed until 1983. The record reflected that Marshall had been diagnosed with asbestosis in 1982. Because of the clear contradiction between the plaintiff's deposition and his later self-serving affidavit, the court ruled that the deposition controlled:
"When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."
Marshall, 56 Wash.App. at 185, 782 P.2d 1107 (quoting Van T. Junkins & Assocs. ., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir.1984)).
Appellants contend that the Marshall rule does not apply because Lede's affidavit, deposition, and trial testimony refer to different time periods, and are therefore not clearly contradictory. In Lede's 1984 affidavit, which encompasses two time periods (1939-44 and 1946-51), he stated that "at least 50%" of PSNS's insulation products were purchased from local distributors such as Brower. Lede testified in his 1984 deposition *794 that from 1939 to 1943, other dealers received only a "smattering of business." Finally, Lede testified in the 1993 trial that from 1949 to 1951, the main supplies of asbestos materials came from manufacturers, and that local distributors, such as Brower, were occasionally used for the smaller amounts.
While Lede's statements contain potential inconsistencies, they are not necessarily contradictory, and certainly do not rise to the level of clear contradiction necessary to invoke the Marshall rule. In Duckworth v. Langland, 95 Wash.App. 1, 8, 988 P.2d 967 (1998), review denied, 138 Wash.2d 1002, 984 P.2d 1033 (1999) this court declined to apply the rule, stating:
Duckworth's declaration is arguably inconsistent with his pleadings, but his statements are not directly contradictory. Because this is a summary judgment appeal, we do not weigh the parties' credibility but resolve all reasonable inferences in favor of the non-moving party. We must accept Duckworth's characterization of the agreement, including the contention that it was subsequently modified.
Similarly, in Safeco Ins. v. McGrath, 63 Wash.App. 170, 174-75, 817 P.2d 861 (1991) this court reversed summary judgment, finding that the party's subsequent sworn testimony was not in "flat contradiction" with his earlier affidavit. Compare McCormick v. Lake Washington Sch. Dist., 99 Wash.App. 107, 111-12, 992 P.2d 511 (1999) (holding that teacher's declaration opposing summary judgment flatly contradicted her earlier deposition testimony such that it could not create an issue of fact as to whether she was a permanent employee).
Here, Lede's statement that at least 50 percent of asbestos-containing products was purchased from local distributors such as Brower from 1939-44 and 1946-51 does not directly contradict his deposition testimony that from 1939-43, the only local supplier he could recall was E.J. Bartells, or his trial testimony that from 1949-51, local distributors such as Brower supplied products "occasionally." The questioning covers overlapping, but not precisely the same time periods, and Lede's answers do not clearly contradict each other. We note too that this case is distinguishable from Marshall, Duckworth, or Safeco in that the latter cases involved testimony by a party about a specific issue in a single case. Here, Lede testified in 1984 and 1993 as a fact witness in unrelated litigation in which Saberhagen was not a party and Brower products were not an issue.[5] Finally, even if we had identified a clear contradiction, the remedy would not have been to strike the entire body of testimony as the trial court did here.
The trial court erred in refusing to consider all of Lede's testimony.
D. Lockwood Criteria
Even considering Lede's testimony, Saberhagen argues that plaintiffs failed to raise an issue of material fact as to whether Berry was exposed to asbestos-containing products supplied by Brower while working at PSNS.
Washington law permits asbestos plaintiffs to establish exposure to a defendant's products through circumstantial evidence. Lockwood v. AC & S, Inc., 109 Wash.2d 235, 247, 744 P.2d 605 (1987) ("[A] plaintiff may rely on the testimony of witnesses who identify manufacturers of asbestos products which were then present at his workplace."). Lockwood identified several factors a court must consider when evaluating whether sufficient evidence of causation exists: (1) plaintiff's proximity to the asbestos *795 product when the exposure occurred and the expanse of the work site where asbestos fibers were released; (2) the extent of time the plaintiff was exposed to the product and (3) the types of asbestos products to which plaintiff was exposed and the ways in which the products were handled and used. Lockwood, 109 Wash.2d at 248, 744 P.2d 605.
The proximity and time factors are satisfied by the fact that Berry worked at PSNS during times that asbestos products were used. Moreover, Drs. Riehl and Smith's testimony that asbestos fibers have the ability to disperse over an entire shipyard is sufficient evidence from which it could be inferred that Berry breathed the asbestos regardless of whether he worked on the ships or only in the shipyard. See, e.g., Kreppein v. Celotex Corp., 969 F.2d 1424 (2d Cir.1992) (affirming liability where plaintiff's evidence did not place plaintiff on a particular ship). Finally, Drs. Churg and Hammar provided evidence that the cumulative effect of the asbestos exposure led to Berry's death.
The critical issue for purposes of summary judgment was whether the plaintiffs raised an issue of material fact as to whether Berry was exposed to Brower products while employed at PSNS. According to Lede's 1984 affidavit, Brower supplied some of the insulation products used at PSNS during both periods (1942 and 1945-50). Moreover, Downey's 1984 testimony that he saw Plant and Carey products "almost every day" during the seven years (1941-48) in which he worked at PSNS, in conjunction with Bradley's testimony that Brower was "a distributor" for Plant and Carey products, raises an issue of fact as to whether Berry was exposed to Brower-supplied products during the time frames in question.
Saberhagen argues that Lede's affidavit leads to impermissible speculation because the plaintiffs do not provide evidence as to "how much or how often PSNS purchased products from Brower, as opposed to Bartells or others." Similarly, Saberhagen claims that Downey and Bradley's testimony does not support an inference of exposure because "Downey did not say who supplied the Plant and Carey products to PSNS" and "Bradley said nothing to suggest that Brower had ever been the sole source for those products either in 1942 or any other time." We reject Saberhagen's argument. Lede's testimony was that local distributors such as Brower were the first source of supplies for small amounts or immediate needs. Plaintiff's evidence is sufficient to raise an inference that Brower products were used at PSNS during the time periods in question. The extent to which Brower supplied the products as compared with other distributors is irrelevant for purposes of summary judgment.
We conclude that the plaintiffs did not abandon their claim of post-World War II exposure at summary judgment, that the trial court erred by refusing to consider Lede's testimony, and that the plaintiffs presented sufficient evidence to raise a genuine issue of material fact as to whether Berry was exposed to Brower products at PSNS.
Reversed and remanded for trial.
WEBSTER, J., and GROSSE, J., concur.
NOTES
[1] Marshall v. AC & S, Inc., 56 Wash.App. 181, 782 P.2d 1107 (1989).
[2] For ease of reference, James Berry will be referred to as "Berry," and those suing on his behalf will be referred to as plaintiffs or appellants.
[3] Lockwood v. AC & S, Inc., 109 Wash.2d 235, 248-49, 744 P.2d 605 (1987), discussed infra.
[4] Marshall v. AC & S, Inc., 56 Wash.App. 181, 782 P.2d 1107 (1989).
[5] Appellants also contend that the Marshall rule only applies where the affidavit contradicts earlier deposition testimony, not vice versa. No Washington court has squarely addressed the issue. Saberhagen points to a Seventh Circuit decision, which held that affidavits that contradict oral testimony would apply regardless of which came first. Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir.1994) ("[T]hough the timing is reversed, the rule is the same."). In Sun Mountain Productions, Inc. v. Pierre, 84 Wash. App. 608, 617-18, 929 P.2d 494 (1997), this court acknowledged Darnell, but declined to address the issue because the affidavit and later deposition did not clearly contradict each other. We decline to reach the issue for the same reason. We note also that Lede signed the affidavit on the same day he was deposed, and it is unclear which testimony preceded the other.