[No. 42543-2-II.   Division Two.   January 29, 2013.]

GARY G. WALSTON ET AL., *Respondents*, v. THE BOEING COMPANY, *Petitioner*.

*William B. Murphy, Bruce D. Campbell, Katherine C. Wax,* and *Eric D. Miller* (of *Perkins Coie LLP*), for petitioner.

*Matthew P. Bergman, Glenn S. Draper, Brian F. Ladenburg,* and *Anna D. Knudson* (of *Bergman Draper Ladenburg PLLC*); and *John W. Phillips* and *John M. Geyman* (of *Phillips Law Group PLLC*), for respondents.

*Kristopher I. Tefft* on behalf of Association of Washington Business and Washington Self-Insurers Association, amici curiae.

*Philip A. Talmadge* on behalf of Washington State Labor Council, amicus curiae.

¶1 VAN DEREN, J. — The Boeing Company appeals the trial court's denial of its motion for summary judgment under RCW 51.04.010 and RCW 51.24.020, which provide that workers' compensation is the exclusive remedy for injured employees subject to the Industrial Insurance Act (IIA), Title 51 RCW, absent an employer's deliberate intention to cause such injury. Because Boeing met its burden to show that no disputed material facts exist here, the burden shifted to Walston to raise a material factual dispute about whether Boeing had actual knowledge that the complained-of asbestos exposure was certain to cause injury and that Boeing willfully disregarded that knowledge. Walston failed to meet that burden; thus, we reverse the trial court's order and remand for entry of an order granting summary judgment to Boeing.

## FACTS

¶2 Gary Walston worked in Boeing's hammer shop at plant 2 in Seattle from 1956 to 1992. Hammer shop workers fabricated a variety of metal airplane parts. Walston asserts that "[d]uring his employment at Boeing, he worked with and around asbestos containing products from various sources and inhaled asbestos fibers into his lungs." Clerk's Papers (CP) at 13. Walston claims that the asbestos exposure at issue occurred when he worked around other employees who were repairing pipe insulation that contained asbestos.[1]

---

[1] Walston identifies other sources of asbestos exposure, such as cutting asbestos board; mixing asbestos powder and oil in the lead plate area; and wearing gloves,

¶3 The hammer shop had asbestos-insulated pipes running the length of the shop ceiling and from the ceiling to the hammer machines. In January 1985, Boeing assigned maintenance workers to repair the pipe insulation because a white powdery substance determined to be asbestos was flaking and falling from the overhead pipes. The maintenance workers rewrapped the overhead pipes to contain the flaking asbestos insulation.

¶4 While performing this work, the maintenance workers used ventilators and were fully enclosed in protective clothing that the hammer shop workers referred to as "moon suits." CP at 2014. Walston and the other hammer shop workers continued to work during the repairs without protective clothing or respirators.

¶5 The 1985 repairs created visible asbestos dust and debris that fell on Walston and the other hammer shop workers. Walston covered his tool box with plastic to stop the dust from accumulating in it. Hammer shop workers, including Walston and John Stewart, asked their supervisor whether they could leave their workstations or wear protective gear during the pipe repair. The supervisor told them to "go back to work" but recommended that the workers avoid working directly under the overhead repairs.[2] CP at 1655. Walston said that the repairs lasted approximately one month, but Stewart recalled that the repairs were finished in only a few days.

¶6 There is no dispute that Boeing was aware that asbestos was a hazardous material well before the 1985 "moon suit incident" in the hammer shop. Walston's evidence shows that Boeing was aware of the dangers associated with

coats, and leggings issued to shop employees. But the issue on appeal is whether there is a material issue of fact about whether Boeing deliberately injured Walston—had actual knowledge of certain injury and willfully disregarded that knowledge—by exposing him to asbestos when abatement contractors repaired asbestos insulation on overhead pipes in the hammer shop in 1985.

[2] Stewart also complained to his union about the asbestos exposure, and the union recommended that he write a letter documenting the exposure for his medical file.

asbestos exposure, including manifestation of asbestos-related diseases decades after initial exposure.[3] The record includes memoranda from Boeing industrial hygiene engineers discussing the risks associated with asbestos exposure, surveys and investigations conducted at Boeing to determine levels of exposure, and procedures and recommendations for reducing worker exposure to asbestos.[4]

---

[3] For example, in December 1972, Boeing issued Industrial Hazards Control Bulletin (IHCB) No. 5, which warned that asbestos dust was "[d]angerously toxic" and that "[i]nhalation of asbestos dust or fibers over prolonged periods may result in lung damage." CP at 5238. On July 18, 1977, industrial hygiene engineers Richard H. Kost and Rick Carbone wrote a memorandum stating that asbestosis results from chronic inhalation of asbestos dust, and that bronchial cancer is associated with asbestos exposure 20 to 30 years after initial exposure. The same document explained the effect of asbestos inhalation on the lungs: "Lung fibrosis is characteristic of asbestos is [sic] with fibrotic lesions tending to be diffuse and predominating primarily in the basal portions of the lung" and "pulmonary fibrosis, -pleural plaques and calcification are early radiologic findings occurring after 20 years of exposure to asbestos and may be found in the absence of any other disease symptoms." CP at 5247.

An undated document titled "Information about Asbestos," authored by Dr. Barry E. Dunphy, Manager at Boeing Corporate Occupational Medicine, states:

> Breathing air which contains hazardous amounts of asbestos fibers causes no discomfort or warning sign at the time of exposure. Ten or more years after breathing air that contains hazardous amounts of asbestos, a serious lung disease called "asbestosis" may slowly begin to develop. Asbestosis causes scarring of the lungs, which may lead to severe impairment of breathing, and even death. Breathing air which contains hazardous amounts of asbestos can also cause an increased risk of lung cancer fifteen to fifty years after exposure. The risk of developing lung cancer due to asbestos is much greater among smokers than among non-smokers. Individuals exposed to hazardous amounts of asbestos may also be at increased risk of developing cancers of the larynx, esoph[a]gus, stomach and large intestine.

CP at 2616.

[4] IHCB No. 5, issued in 1972, stated that workers should avoid breathing asbestos dust or fibers, and that respirators should be used for the removal or demolition of asbestos insulation or coverings.

A Boeing industrial hygiene investigation conducted on May 14, 1977, revealed that removal of asbestos-containing materials would result in excessive asbestos exposure. Based on that investigation, Kost recommended that Boeing limit asbestos exposure in work environments, train employees about the hazards of asbestos and the importance of following procedures and precautions, evaluate current respiratory requirements and equipment, and provide easier access to protective equipment.

¶7   Between October 1978 and 1986, Boeing received at least three workers' compensation claims based on asbestos-related injuries at Boeing facilities in Renton and Auburn. Also, in 1981, another hammer shop employee, who worked there from 1957 to 1975, sued an asbestos manufacturer based on his developing cancer from asbestos exposure in Boeing's hammer shop.[5] In the late 1980s, Boeing received similar workers' compensations claims alleging asbestos related injuries, including mesothelioma, which is cancer in the lung lining.

¶8   Walston's experts, Dr. Arnold Brody, a cellular biologist; Dr. Richard Lemen, an epidemiologist; and Dr. Carl Brodkin, a physician who examined Walston's medical records variously opined that exposure to asbestos causes

---

In January 1978, N.P. Novak, a Boeing industrial hygiene engineer, wrote in a memorandum evaluating asbestos use that due to the carcinogenic potential of asbestos, the National Institute for Occupational Safety and Health recommended setting the exposure limit at the lowest level detectable by available analytical techniques. He explained that the recommended standard was "intended to protect against the noncarcinogenic effects of asbestos, and substantially reduce the risk of asbestos-induced cancer." CP at 3231. He wrote in a parenthetical that "[o]nly a ban can assure protection against the carcinogenic effects of asbestos." CP at 3231.

In 1980, Boeing industrial hygiene engineer Thomas P. O'Keeffe reported on a survey taken to evaluate possible employee exposures to asbestos from falling insulation matter. O'Keeffe wrote that air samples indicated that ambient levels of asbestos were well below 0.1 fibers per cubic centimeter, but he recommended that fallen insulation material should be cleaned up and handled as asbestos and that Boeing should take actions to remove the ceiling insulation or bind it to prevent it from falling on employees and possibly increasing asbestos levels in the ambient air.

In 1982, Novak wrote that stripping and removing asbestos insulation on pipes generates the highest airborne concentrations of asbestos out of any operations monitored at Boeing. In April 1983, J.W. LaLonde, the Boeing fabrication division safety manager, ordered asbestos ceiling insulation to be encapsulated or sealed to eliminate a source for potential employee overexposure in a building at Boeing's Auburn facility. The memorandum stated that although the levels of asbestos fibers were not such that would lead to asbestosis, "Boeing Medical-Occupational Health [wa]s concerned about the possibility of lower exposures leading to lung cancer and mesothelioma." CP at 5305.

[5] Although the employee did not sue Boeing, Boeing became aware of the lawsuit at least by February 6, 1985, when it a received a request for third-party discovery.

cellular level lung injury that increases the risk of develop-
ing an asbestos-related disease.[6] But these same experts

---

[6] Dr. Brody explained in his declaration that when humans breathe asbestos fibers, the body has good defense mechanisms for shielding and clearing the fibers out of the lung. But if an individual is repeatedly exposed, some proportion of the fibers will cause scarring and injury at the cellular level. Visible scar tissue in the lungs caused by exposure to asbestos fibers is asbestosis. Asbestos can also cause mesothelioma and bronchogenic carcinoma (lung cancer) because lung cells divide to replace injured ones, thereby increasing the opportunity for cancer to develop. Dr. Brody declared, "The more often an individual is exposed [to asbestos], the more of these cellular and molecular injures are sustained and the more likely the individual is to develop cancer," but "[n]ot all injuries result in asbestosis or cancer." CP at 1025-26 (emphasis added). He also opined that a person "exposed to asbestos at levels above background can sustain microscopic injury to their lung tissue" within 48 hours of exposure to asbestos, and if the person continues to be exposed to asbestos, the early microscopic injuries "can result in clinical manifestation of disease decades after the initial exposures." CP at 1026.

Similarly, Dr. Lemen, who helped draft the initial Occupational Safety and Health Administration asbestos exposure standards in the early 1970s, declared that every "exposure to asbestos constitutes an injury in and of itself," but "not every injurious exposure to asbestos manifests itself in asbestos disease." CP at 1065 (emphasis added). And Dr. Brodkin testified in his deposition that an asbestos fiber in the lungs creates an inflammatory response at the cellular level that an individual is not aware of. He said that persons with only ambient exposure to asbestos breathing in the city of Seattle, for example, may have asbestos fibers in their lungs causing the same type of cellular inflammation injury but, at such a low concentration, there is not a demonstrated increased clinical risk of disease. A cellular injury from asbestos exposure puts a person at an increased risk for asbestos-related disease, but it does not mean that disease will occur.

Dr. Brodkin also described the process by which asbestos fibers cause mesothelioma. He explained that asbestos exposure sufficient to overcome the body's defenses causes a direct genetic injury to an individual's deoxyribonucleic acid (DNA). Then "subsequent injuries and exposures [to asbestos] over many generations of cells . . . increase the changes in the DNA, the behavior of the cells, [and] potentially alter[s ]cellular division." CP at 2850. Eventually, clinical tumors and clinical illnesses develop. Mesothelioma is a tumor in the lining of the lung or pleura. Dr. Brodkin testified that the subclinical process and tumor initiation caused by the interaction between the asbestos fiber and the DNA begins shortly after inhalation, but that process does not produce symptoms of illness. The "time between exposure and development of illness is called the 'latent period.' " CP at 2850. Asbestos-related diseases have a prolonged latent period, often decades. For mesothelioma, an average latency may be 35 years. The "latency is one of sub-clinical effects, where there is injury to the DNA, tumor initiation and tumor promotion" but "[i]t's not until the . . . change in the behavior of the cells, and the development of a clinically apparent tumor, that one gets the clinical illness, . . . and usually diagnoses are obtained at that time." CP at 2850.

Dr. Brodkin related that the relationship between exposure to asbestos and risk of mesothelioma is called "dose response." CP at 2853. Medical science has not determined whether there is a threshold exposure below which there is no

also admitted that no amount of exposure to asbestos is certain to result in disease.

¶9 In 2010, Walston was diagnosed with mesothelioma. Walston sued Boeing, alleging that he contracted mesothelioma as a result of his exposure to asbestos while working at Boeing.[7] Boeing moved for summary judgment

---

clinically significant increased risk and above which there is a clinically significant increased risk; but as dose ranges increase, so does the risk of mesothelioma. There is no level of exposure to asbestos that will guarantee that the exposed person develops mesothelioma or other asbestos related disease. "Mesothelioma is a – overall, a rare disease. As dose increases, the risk for [m]esothelioma increases[,] . . . but . . . there is not an exposure which all individuals will develop [m]esothelioma" or other asbestos related diseases. CP at 2855. Mesothelioma is extremely rare in the general population, including exposed workers. But among certain groups of workers with the highest cumulative asbestos exposure, such as asbestos insulators, the rate of mesothelioma rises to nine percent.

When asked whether asbestos exposure is certain to cause injury, Dr. Brodkin said:

> [I]n terms of the exposures that I have evaluated with . . . Walston, [it] would certainly cause increased risk for injury [but] it doesn't guarantee that disease will occur.
>
> . . . .
>
> But a hypothetical individual with similar exposure [as Walston], I can't say with certainty that they would develop disease. They would have increased risk for disease. They would likely have injury at a cellular level, but whether that would eventually be manifest by disease, I couldn't say with certainty.

CP at 2865 (emphasis added). Dr. Brodkin clarified that in an isolated incident, exposure to asbestos is not certain even to cause injury at the cellular level, but significant asbestos exposure over time is likely or almost certain to cause cellular injury. Dr. Brodkin characterized Walston's career exposure as significant exposure over time and testified that Walston's proximity to a larger scale rip out or removal of pipe insulation, which was described as the "moon suit incident" by Walston and his co-workers, represented a very significant exposure—likely the highest level of exposure experienced by Walston.

[7] By the time Walston was diagnosed with mesothelioma he was over 65 years old and a combination of Medicare and his supplemental medical insurance policy covered his medical costs. Thus, he never applied for workers compensation benefits since he could not get wage loss and had no out-of-pocket expenses related to the disease.

Donna Walston also brought claims against Boeing for (1) her own alleged exposure to asbestos based on laundering her husband's asbestos-laden work clothes and (2) loss of consortium arising out of her husband's exposure and injury. By stipulation, Donna Walston's claims arising from her own alleged exposure to asbestos, including fear of future cancer, were dismissed. Her claims for loss of consortium remain pending, but they are not the focus of this appeal. The Walstons also sued Saberhagen Holdings for supplying asbestos-containing products to Boeing; but the trial court dismissed the claims against Saberhagen.

dismissing Walston's claims because it was entitled to employer immunity under the exclusivity provisions of the IIA. The trial court denied Boeing's motion for summary judgment. We granted Boeing's petition for discretionary review of the trial court's denial of its summary judgment motion.

## ANALYSIS

### I. Standard of Review

¶10 We review a trial court's denial of a motion for summary judgment de novo. *Baker v. Schatz*, 80 Wn. App. 775, 782, 912 P.2d 501 (1996). "Summary judgment should only be granted if after considering all the pleadings, affidavits, depositions or admissions and all reasonable inferences drawn therefrom in favor of the nonmoving party, it can be said (1) that there is no genuine issue as to any material fact, (2) that all reasonable persons could reach only one conclusion, and (3) that the moving party is entitled to judgment as a matter of law." *Baker*, 80 Wn. App. at 782.

### II. Washington's Industrial Insurance Act

¶11 The IIA created a swift and certain no-fault workers' compensation system for injured employees in exchange for granting employers immunity from lawsuits arising from workplace injuries. RCW 51.04.010; *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). But employers who deliberately injure their employees are not immune from civil suits by employees who are entitled to compensation under the IIA.[8] RCW 51.24.020 provides:

> If injury results to a worker from the *deliberate intention of his or her employer to produce such injury*, the worker or

---

[8] "Employers who engage in such egregious conduct should not burden and compromise the industrial insurance risk pool." *Birklid v. Boeing Co.*, 127 Wn.2d 853, 859, 904 P.2d 278 (1995).

beneficiary of the worker shall have the privilege to take under this title and also have cause of action against the employer as if this title had not been enacted, for any damages in excess of compensation and benefits paid or payable under this title.

(Emphasis added.) Washington courts have consistently interpreted RCW 51.24.020 to require proof of the employer's specific intent to injure an employee before the employee can maintain a separate cause of action against a covered employer. *Vallandigham*, 154 Wn.2d at 27.

¶12 Until 1995, our courts applied the "deliberate intention" exception to the workers' compensation statute only where there had been a physical assault by one worker against another. *See, e.g., Perry v. Beverage*, 121 Wash. 652, 655, 659-60, 209 P. 1102 (1922), 214 P. 146 (1923) (supervisor struck employee in the face with a water pitcher during an argument); *Mason v. Kenyon Zero Storage*, 71 Wn. App. 5, 7, 9, 856 P.2d 410 (1993) (forklift driver purposely crushed another worker between two drums). But in 1995, in *Birklid v. Boeing Company*, our Supreme Court held that "deliberate intention" is not limited to physical assaults but includes incidents where the employer *(1)* has *"actual knowledge that an injury is certain to occur"* and *(2)* *"willfully disregard[s] that knowledge."* 127 Wn.2d 853, 865, 904 P.2d 278 (1995). The court expressly rejected the more lenient "substantial certainty"[9] and "conscious weighing"[10] tests used by other states with similar "deliberate intention" statutory provisions. *Birklid*, 127 Wn.2d at 865.

---

[9] Under the "substantial certainty" test, " '[i]f the actor knows that the consequences are *certain*, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.' " *Birklid*, 127 Wn.2d at 864 (emphasis added) (internal quotation marks omitted) (quoting *Beauchamp v. Dow Chem. Co.*, 427 Mich. 1, 21-22, 398 N.W.2d 882 (1986)).

[10] Oregon's "conscious weighing" test focuses on "whether the employer had an opportunity consciously to weigh the consequences of its act and knew that someone, not necessarily the plaintiff specifically, would be injured." *Birklid*, 127 Wn.2d at 865 (citing *Lusk v. Monaco Motor Homes, Inc.*, 97 Or. App. 182, 185, 775 P.2d 891 (1989) (interpreting Or. Rev. Stat. § 656.156(2))).

III. Cases Applying the *Birklid* Standard

¶13 In *Birklid*, Boeing " '[e]mployees complained of dizziness, dryness in nose and throat, burning eyes, and upset stomach[s]' " during preproduction testing of a new material containing phenol-formaldehyde. 127 Wn.2d at 856 (quoting *Birklid* Clerk's Papers at 115). A Boeing supervisor reported the employees' symptoms, advised that the effects would likely worsen as production and temperatures increased, and requested improved ventilation in the work area. *Birklid*, 127 Wn.2d at 856. Boeing denied the request. *Birklid*, 127 Wn.2d at 856. Boeing proceeded with production of the new material, and as anticipated, its workers became sick. *Birklid*, 127 Wn.2d at 856.

¶14 When addressing the "deliberate intention" issue raised in the employees' lawsuit subsequently filed against Boeing, our Supreme Court distinguished all prior cases decided under the "deliberate intention" exception by explaining that in this instance Boeing knew in advance its workers would become ill. *Birklid*, 127 Wn.2d at 863. It held that in earlier cases, employers may have been aware that they were exposing workers to unsafe conditions, but workers were not being injured until accidents occurred. *Birklid*, 127 Wn.2d at 860-61, 863 (citing *Foster v. Allsop Automatic, Inc.*, 86 Wn.2d 579, 580, 547 P.2d 856 (1976); *Biggs v. Donovan-Corkery Logging Co.*, 185 Wash. 284, 285-86, 54 P.2d 235 (1936); *Delthony v. Standard Furniture Co.*, 119 Wash. 298, 299-300, 205 P. 379 (1922); *Nielson v. Wolfkill Corp.*, 47 Wn. App. 352, 354, 734 P.2d 961 (1987); *Peterick v. State*, 22 Wn. App. 163, 166-67, 189, 589 P.2d 250 (1977), *overruled on other grounds by Stenberg v. Pac. Power & Light Co.*, 104 Wn.2d 710, 719-20, 709 P.2d 793 (1985)); *Higley v. Weyerhaeuser Co.*, 13 Wn. App. 269, 270, 534 P.2d 596 (1975); *Winterroth v. Meats, Inc.*, 10 Wn. App. 7, 8, 516 P.2d 522 (1973). It further held that the Boeing employees presented sufficient evidence to justify a trier of fact's finding that Boeing deliberately intended to injure them. *Birklid*, 127 Wn.2d at 865-66.

¶15 Following *Birklid's* articulation of the proper standard to apply when employees covered by the workers' compensation system allege a deliberate intent to injure, two cases—*Hope v. Larry's Markets*, 108 Wn. App. 185, 193-94, 29 P.3d 1268 (2001), *overruled by Vallandigham*, 154 Wn.2d at 35, and *Baker*, 80 Wn. App. at 777-79—addressed employment situations involving employees who were repeatedly exposed to chemicals that made them visibly sick and who complained of illness and injury at the time of exposure. The employees in *Hope* and *Baker* satisfied the "actual knowledge" prong of the deliberate injury test by providing evidence that the employer knew that employees were suffering injuries from chemical exposure and that they would continue to do so until the exposure stopped. *Hope*, 108 Wn. App. at 194; *Baker*, 80 Wn. App. at 783-84. The employees in both cases also presented evidence relevant to the employers' "willful disregard" of that knowledge.[11] *Hope*, 108 Wn. App. at 194-95; *Baker*, 80 Wn. App. at 783-84. These cases held that the employees' evidence was sufficient to justify a trier of fact finding deliberate intention to injure and the employees were entitled to have a jury determine whether the employer deliberately intended to injure them, thus precluding summary judgment in favor of the employer. *Hope*, 108 Wn. App. at 195; *Baker*, 80 Wn. App. at 784.

■ ¶16 In *Shellenbarger v. Longview Fibre Co.*—an asbestos exposure case—Division One of this court affirmed summary judgment for the employer, holding that a fact finder could not reasonably conclude that Longview Fibre had actual knowledge of certain injury. 125 Wn. App. 41, 43, 103 P.3d 807 (2004). Shellenbarger developed asbestosis and lung disease allegedly as a result of asbestos exposure during his employment at Longview Fibre Company. *Shellenbarger*, 125 Wn. App. at 43-45. The court

---

[11] The Supreme Court expressly disapproved of *Hope*, 108 Wn. App. at 194-95, insofar as it held that ineffective remedial measures satisfy the willful disregard prong of the *Birklid* standard. *Vallandigham*, 154 Wn.2d at 35.

reasoned that although the employer became aware of the dangers of asbestos, evidenced by the employer's warning employees in its "Special Hazards Manual" that asbestos could lead to asbestosis and advising employees to wear a respirator when around asbestos dust, knowledge of risk of injury is not knowledge of certain injury. *Shellenbarger*, 125 Wn. App. at 44-45, 48-49. The court held that "the relevant inquiry is not whether the employer knew it was performing a dangerous activity, but rather whether the employer knew of certain injury." *Shellenbarger*, 125 Wn. App. at 49. The *Shellenbarger* court reiterated that under *Birklid*, "known risk of harm or carelessness is not enough to establish certain injury, even when the risk is substantial." *Shellenbarger*, 125 Wn. App. at 47.

¶17 Ten years after *Birklid*, in *Vallandigham*, our Supreme Court further elaborated on the *Birklid* standard. 154 Wn.2d at 29. In *Vallandigham*, school district employees sued to recover for injuries caused by a severely disabled special education student. 154 Wn.2d at 17. Although the student had allegedly injured staff members and students 96 times during one school year, our Supreme Court held that "the behavior of a child with special needs is far from predictable"; thus, the school district could not *know* that the child would continue to injure employees; and, thus, the school district could not be sued by employees for intentionally causing them injuries. *Vallandigham*, 154 Wn.2d at 33-34. In distinguishing *Birklid*, the court recognized that the impact of exposure to a chemical is predictable in a way that the behavior of a special education student is not. *Vallandigham*, 154 Wn.2d at 24, 33-34. The Court emphasized that "[d]isregard of a *risk* of injury is not sufficient to meet the first *Birklid* prong; *certainty* of actual harm must be known and ignored." *Vallandigham*, 154 Wn.2d at 28.

IV. WALSTON'S CLAIM DOES NOT SATISFY THE *BIRKLID* STANDARD

¶18 Walston claims that he presented evidence raising a material factual dispute about whether Boeing had (1)

actual knowledge that he was certain to be injured and (2) that Boeing willfully disregarded such knowledge. Walston argues that he—like the employees in *Birklid, Hope,* and *Baker*—was injured as a result of being exposed to a substance at work that his employer knew was certain to injure him.

¶19 But the facts in *Birklid, Hope,* and *Baker* differ from this case in an important way. When exposed to the injurious chemical, the *Birklid, Hope,* and *Baker* employees became visibly sick—exhibiting symptoms such as passing out, dizziness, burning eyes, upset stomach, difficulty breathing, nausea, headaches, and skin rashes and blisters—and complained to their employers about the effect of the chemical exposure. *Birklid,* 127 Wn.2d at 856; *Hope,* 108 Wn. App. at 189-91, 194; *Baker,* 80 Wn. App. at 778-79, 783-84. These employees' visible injuries and complaints created a reasonable inference that the employers had actual knowledge of certain injury to its employees. *Birklid,* 127 Wn.2d at 856, 863, 865-66; *Hope,* 108 Wn. App. at 194; *Baker,* 80 Wn. App. at 783-84. In *Vallandigham,* our Supreme Court also acknowledged that "in cases involving chemical exposure, repeated, continuous injury and the observation of the injury by the employer can satisfy the first prong of the *Birklid* test." 154 Wn.2d at 30-31 (citing *Hope,* 108 Wn. App. at 193-94).

¶20 Here, unlike in *Birklid, Hope,* and *Baker,* where the injury to the employees was immediate and obvious, Walston and his co-workers were not immediately or visibly injured by the exposure to asbestos. Nor did they complain of injuries caused from their exposure to asbestos. Walston was not diagnosed with an asbestos related disease until 25 years after the "moon suit incident" in the hammer shop. The immediate visible effects of chemical exposure present in *Birklid, Hope,* and *Baker* provided the requisite material issue of fact relating to the employer's actual knowledge of certain injury. *Birklid,* 127 Wn.2d at 856, 863, 865-66; *Hope,* 108 Wn. App. at 194; *Baker,* 80 Wn. App. at 783-84. But

here, there is no material factual dispute relating to Walston's injury and Boeing's alleged actual knowledge that injury was certain to occur.

¶21 Walston argues that Washington has adopted a more liberal standard of proof in asbestos injury cases that allows his case to survive summary judgment. He relies on *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 248-49, 744 P.2d 605 (1987); *Berry v. Crown Cork & Seal Co.*, 103 Wn. App. 312, 324-25, 14 P.3d 789 (2000); and *Mavroudis v. Pittsburgh-Corning Corp.*, 86 Wn. App. 22, 32, 935 P.2d 684 (1997) to support this argument. *Lockwood*, *Berry*, and *Mavroudis* recognize that the peculiar nature of asbestos products and development of asbestos-related disease make it difficult to prove causation. *Lockwood*, 109 Wn.2d at 248-49; *Berry*, 103 Wn. App. at 323-25; *Mavroudis*, 86 Wn. App. at 31-33. For purposes of summary judgment and this appeal, Boeing does not deny that Walston produced evidence showing that his mesothelioma was caused by his exposure to asbestos while he was an employee at Boeing. Thus, the relaxed proof standard related to causation does not apply here, where the issue is whether Walston has provided evidence showing that Boeing had actual knowledge that its employees were certain to contract an asbestos-related disease. That issue requires wholly separate evidence.

¶22 Walston first attempts to bridge the gap between his injury and Boeing's alleged actual knowledge that injury was certain to occur by showing that even though its workers were not suffering immediate visible injuries, Boeing knew that diseases caused by asbestos exposure have long latency periods and that they materialize at some later date. He points to at least three workers' compensation claims against Boeing alleging asbestos-related injuries between 1978 and 1986, and a 1981 lawsuit by a Boeing employee against a third-party asbestos manufacturer that alleged asbestos-caused cancer.

¶23 But the record here does not support a holding that Boeing's awareness that some workers developed asbestos-

related diseases raised a material issue of fact about whether Boeing knew that exposing employees to asbestos during the pipe repair in 1985 was certain to injure them. As Division One recognized in *Shellenbarger*, not everyone exposed to asbestos develops an asbestos related disease. 125 Wn. App. at 49. Even Walston's experts conceded that there is no known threshold of exposure to asbestos that results in certain asbestos related disease.

¶24 Walston secondarily argues that certainty of injury can be shown through expert testimony that a cellular injury occurs when a person is exposed to asbestos and that the relevant injury is the cellular injury, not the disease contracted following a long latency period. Walston's experts described a subclinical[12] cellular inflammation caused by asbestos fibers that may result in abnormal cell division that increases the chance of a genetic defect in the division of cells, leading to cancer. We are mindful of the narrow exception the legislature provided and the strict standard announced by our Supreme Court in *Birklid* that preclude holding that Walston has shown that Boeing had actual knowledge of certain injury in the absence of clinical symptoms and based only on asbestos-caused cellular inflammation and irregular cell division increasing the risk of an asbestos related disease. *See Vallandigham*, 154 Wn.2d at 28.

¶25 Walston also points to various internal Boeing documents discussing the risk of asbestos exposure and its potential to cause injury years after exposure. This evidence does show that Boeing knew that exposure to asbestos was dangerous to its employees because it increased the risk that an asbestos-related disease could materialize. Never-

---

[12] A "subclinical" cellular inflammation would not be detectable as a disease in a medical examination. *See* STEDMAN'S MEDICAL DICTIONARY 1692 (26th ed. 1995) (defining "subclinical" as "[d]enoting the presence of a disease without manifest symptoms; may be an early stage in the evolution of a disease"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2273 (2002) (defining "subclinical" as "marked by only slight abnormality and not being such as to give rise to overt symptoms : not detectable by the usual clinical tests").

theless, "the relevant inquiry is not whether the employer knew it was performing a dangerous activity, but rather whether the employer knew of certain injury." *Shellenbarger*, 125 Wn. App. at 49. In *Birklid*, our Supreme Court acknowledged that the deliberate intent exception was very narrow. 127 Wn.2d at 865. Risk of injury, even risk amounting to substantial certainty of injury, is not the certain injury mandated under the *Birklid* test. 127 Wn.2d at 865; *Vallandigham*, 154 Wn.2d at 28.

¶26 Walston has not directed us to any evidence in the record demonstrating that a material factual dispute about whether Boeing had actual knowledge in 1985 that asbestos exposure was certain to cause injury; nor did our independent search of the record uncover such evidence. Here, as in *Shellenbarger*, a reasonable fact finder could not conclude that the employer knew with certainty that any employee would be injured by asbestos exposure in the workplace. *See* 125 Wn. App. at 49. Under these facts (no actual knowledge of certain injury), we need not reach the second prong of the *Birklid* deliberate intent test, which considers whether the employer willfully disregarded actual knowledge of certain injury.[13]

---

[13] Because most courts applying the *Birklid* test have held that the employer did not have actual knowledge that injury was certain to occur, few courts have considered whether an employer willfully disregarded such knowledge. *See, e.g.*, *French v. Uribe, Inc.*, 132 Wn. App. 1, 12, 130 P.3d 370 (2006); *Crow v. Boeing Co.*, 129 Wn. App. 318, 330, 118 P.3d 894 (2005); *Shellenbarger*, 125 Wn. App. at 49; *Byrd v. Sys. Transp., Inc.*, 124 Wn. App. 196, 205, 99 P.3d 394 (2004). In *Stenger v. Stanwood School District*, 95 Wn. App. 802, 813-16, 977 P.2d 660 (1999), *overruled by Vallandigham*, 154 Wn.2d at 35, and *Hope*, 108 Wn. App. at 194-95, Division One of this court focused on the adequacy or effectiveness of attempted remedial measures. In *Stenger*, school employees sued their school district to recover for injuries caused by a special education student. 95 Wn. App. at 803. Division One of this court held that "a jury could reasonably conclude that the [school d]istrict had actual knowledge that the staff would continue to be injured by [the student] in the future" and the district's efforts to prevent injury were inadequate and, thus, amounted to willful disregard of certain injury. *Stenger*, 95 Wn. App. at 813-14, 816-17. The district did not file a petition for review with the Supreme Court, but the court's holding in *Vallandigham*, on very similar facts, abrogated *Stenger*. *See* 154 Wn.2d at 31-32, 34-35.

Our Supreme Court in *Vallandigham* did not reach the willful disregard issue in its analysis but, in dicta, it disapproved of the holdings in *Stenger* and *Hope* to

¶27 In sum, Boeing met its burden to show that there is no dispute of material fact that Boeing knew in 1985 that the pipe repairs in the hammer shop were certain to cause injury to its employees. After Boeing met its burden, the burden shifted to Walston to raise a genuine issue of material fact about Boeing's knowledge of certainty of injury to the Boeing employees in the hammer shop in 1985. *See Vallandigham*, 154 Wn.2d at 35. This he failed to do.

¶28 Because Walston has failed to carry his burden to demonstrate that there remains a material question of fact about Boeing's actual knowledge of certain injury as required by RCW 51.24.020, Boeing is immune from Walston's suit for workplace injury under RCW 51.04.010. Accordingly, Boeing is entitled to summary judgment as a matter of law. *Vallandigham*, 154 Wn.2d at 35.

¶29 We reverse the trial court's denial of Boeing's summary judgment order and remand to the trial court for entry of an order granting summary judgment to Boeing on Walston's claims.[14]

HUNT and QUINN-BRINTNALL, JJ., concur.

Review granted at 177 Wn.2d 1019 (2013).

---

the extent that they suggested a finding of willful disregard can be based on the simple fact that an employer's remedial efforts were ineffective. *Vallandigham*, 154 Wn.2d at 34-35; *see Stenger*, 95 Wn. App. at 813; *Hope*, 108 Wn. App. at 195. The Supreme Court "reject[ed] any notion that a reasonableness or negligence standard should be applied to determine whether an employer has acted with willful disregard." *Vallandigham*, 154 Wn.2d at 35. It held that willful disregard may not be met by showing that the employer's remedial action is ineffective. *Vallandigham*, 154 Wn.2d at 28, 34-35.

[14] Donna Walston's claims for loss of consortium arising from her husband's injury are still pending. Those claims are not addressed in this appeal, but because we hold that Boeing is entitled to summary judgment on her husband's personal injury claims, the trial court will undoubtedly address the continuing viability of her claims.